**David OSHER, on behalf of himself and all others similarly situated, Plaintiffs,**

v.

**JNI CORPORATION, et al., Defendants.**

**No. 01 CV 557 J(NLS).**

United States District Court, S.D. California.

March 10, 2004.

---

William S. Lerach, Spencer Alan Burkholz, Milberg, Weiss, Bershad, Hynes and Lerach, San Diego, CA, Andrew L. Barroway, Schiffrin and Barroway, Bala Cynwyd, PA, Francis Michael Gregorek, Wolf, Haldenstein, Adler, Freeman and Herz, San Diego, CA, Leigh A. Parker, Weiss and Yourman, Los Angeles, CA, for plaintiffs.

Robert W. Brownlie, Gray, Cary, Ware and Freidenrich, San Diego, CA, for defendants.

Leigh A. Parker, Weiss and Yourman, Los Angeles, CA, for movants.

**ORDER: (1) DENYING DEFENDANTS' REQUEST FOR JUDICIAL NOTICE [Doc. No. 126](2) GRANTING MOTION TO DISMISS THIRD AMENDED CONSOLIDATED COMPLAINT [Doc. No. 124]**

JONES, District Judge.

By order dated August 25, 2003, the Court dismissed Plaintiffs' Second Amended Consolidated Complaint ("SACC") without prejudice and with leave to amend. On October 31, 2003, Plaintiffs filed their Third Amended Consolidated Complaint ("TACC"). Defendants have now moved to dismiss the TACC. (Doc. No. 124.) The Court finds this matter suitable for decision on the papers and without oral argument pursuant to Civil Local Rule 7.2(d)(1).

### Background

#### I. Factual History

Plaintiffs represent a class of all purchasers of common stock of JNI Corporation ("JNI") between July 13, 2000, and March 28, 2001 (the "class period"). (TACC ¶ 1.) Plaintiffs allege that JNI's officers and directors conspired to artificially inflate the price of JNI stock during the class period so they could sell their personal holdings of JNI stock at inflated prices. (*Id.* ¶ 3.)

JNI designs and supplies Fibre Channel hardware and software products that connect computer servers and data storage devices to form storage area networks

("SANs"). (*Id.* ¶ 2.) Fibre Channel technology improves data communication speeds, connectivity, distance between connections, reliability and accessibility. (*Id.*) JNI markets a broad range of Fibre Channel host bus adapters and software products that facilitate advanced SANs device integration and management. (*Id.*)

JNI's initial public offering ("IPO") occurred in October 1999, at which time its stock was priced at approximately $25 per share. (*Id.* ¶ 4.) Following the IPO, a parent company named Jaymark, Inc. held sixty percent of JNI's stock. (*Id.*) By the summer of 2000, JNI's stock was trading for about $25 per share, down from a prior range of $80–$100 per share. (*Id.*) Around this time, Plaintiffs allege that Defendants "devised a scheme to artificially inflate JNI's stock price and distribute their shares in an October 19, 2000, Secondary Offering." (*Id.*) In July 2000, Jaymark reorganized and distributed all its JNI stock to its shareholders, including Defendants Eric P. Wenaas, Terry M. Flanagan, Thomas K. Gregory, Charles McKnett, and John Stiska. (*Id.*) Pursuant to lock-up agreements, Defendants were limited in the amount of JNI stock they could sell through the Secondary Offering. (*Id.*) In the weeks prior to Jaymark's reorganization, Plaintiffs claim Defendants made false and misleading statements in the form of press releases and statements to analysts. (*Id.* ¶¶ 55–60.)

On October 25, 2000, JNI completed its Secondary Offering at the price of $74 per share. (*Id.* ¶ 78.) The Secondary Offering provided net proceeds of $69 million to JNI and $245 million to Jaymark's shareholders, including $32 million to the individual defendants. (*Id.* ¶ 5.) Around the time of the Secondary Offering, Plaintiffs claim Defendants made a number of false and misleading statements designed to inflate the price of JNI stock. (*Id.* ¶¶ 73–79.) These statements were made (1) during a roadshow in October 2000, prior to the offering, (2) in a press release issued October 16, 2000, in which Defendants announced JNI's results for third quarter 2000, (3) during a conference call with analysts and investors on October 16, 2000, and (4) in JNI's prospectus dated October 19, 2000, issued in connection with the Secondary Offering. (*Id.* ¶¶ 73, 74, 76, 78.) As a result of Defendants' allegedly false and misleading statements, a number of analysts issued extremely favorable reports about JNI and raised their earning estimates for JNI for the upcoming quarter and fiscal year. (*Id.* ¶¶ 94, 95.) JNI's stock price peaked at $126 per share on November 6, 2000. (*Id.* ¶ 98.)

After the Secondary Offering and throughout the remainder of the class period, Plaintiffs claim Defendants continued to make false and misleading statements about JNI's performance and prospects. In November 2000, after unfavorable reports about JNI appeared in the media and JNI's stock's dropped to $63 per share, JNI made statements in a press release and during a conference call that Plaintiffs claim were false or misleading. (*Id.* ¶¶ 13, 107.) On December 11, 2000, JNI announced a lower-than-expected range of growth for fourth quarter 2000, causing JNI's stock to drop to $34–3/4 per share. (*Id.* ¶¶ 117–18.) Plaintiffs claim this announcement was misleading because JNI failed to disclose that results for fiscal year 2001 would also be "significantly lower" than estimates. (*Id.* ¶ 123.) On January 24, 2001, JNI reported its fourth quarter 2000 revenues and lowered its projections for fiscal year 2001, causing JNI's stock price to drop further to $20.06 per share. (*Id.* ¶ 16.) Plaintiffs claim this announcement was misleading because Defendants projected a strong second half for fiscal year 2001 and allegedly used accounting manipulations to inflate the reported results. (*Id.*) Finally, on March 28, 2001, JNI revised its forecast for first

quarter 2001 downward and announced that revenues and earnings per share for fiscal year 2001 would be lower than projected. (*Id.* ¶ 17.) Following this announcement, JNI's stock dropped to $7–3/8 per share, and was trading at less than $7 per share at the time the TACC was filed. (*Id.*)

## II. Procedural History

In April 2001, six securities fraud actions were filed in this district against JNI and its officers and directors. The Court subsequently consolidated the six related actions, appointed lead plaintiffs, and ordered lead plaintiffs to file an amended consolidated complaint. (Order Clarifying Order Granting Motions to Consolidate (February 21, 2002).)

On March 25, 2002, Plaintiffs filed their First Amended Consolidated Complaint ("FACC"), naming as defendants JNI, former President and Chief Executive Officer Terry Flanagan, Chief Financial Officer Gloria Purdy, Chief Operating Officer Thomas Gregory, Chief Technology Officer Charles McKnett, JNI Chairman and Jaymark CEO Eric Wenaas, and JNI director John Stiska. (FACC ¶¶ 22–23.) The FACC alleged five claims for relief: (1) violation of Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b–5 against all Defendants, (2) violation of Section 20(a) of the 1934 Act against Flanagan, Purdy and Wenaas, (3) violation of Section 11 of the Securities Act of 1933 ("1933 Act") against JNI, Flana-

gan, Purdy, Wenaas, and Stiska, (4) violation of Section 12(a)(2) of the 1933 Act against all Defendants, and (5) violation of Section 15 of the 1933 Act against Wenaas, Flanagan and Purdy. Defendants moved to dismiss the FACC. By order dated March 26, 2003, the Court granted Defendants' motion to dismiss without prejudice and set forth specific pleading deficiencies for Plaintiffs to correct in an amended complaint. (Order Granting Motion to Dismiss (March 26, 2003) at 26–27 ("Order I").) On May 27, 2003, Plaintiffs filed a SACC, naming the same defendants and alleging the same five claims. Defendants again filed a motion to dismiss. On August 25, 2003, the Court granted Defendants' motion to dismiss the SACC without prejudice. (Ordering Granting Motion to Dismiss (Aug. 25, 2003) at 26–27 ("Order II").) Plaintiffs were advised that they would be given one additional opportunity to amend their complaint, after which no further amendments would be permitted. (*Id.*)

 On October 31, 2003, Plaintiffs filed a TACC. In this Complaint, Plaintiffs make allegations against the same six Defendants named in the previous two complaints. However, the Complaint alleges only two claims for relief, in contrast to the original five, (1) violation of Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b–5 against all Defendants and (2) violation of Section 20(a) of the 1934 Act against Flanagan, Purdy, and Wenaas.[1] (TACC ¶ 20.) On

---

**1.** In their Memorandum of Points and Authorities in support of their motion to dismiss, Defendants note that "Plaintiffs have apparently decided they cannot plead claims for violation of Section 11 and 12(a)(2) of the Securities Act of 1933 (15 U.S.C. §§ 77k, 77l(a)(2)) and have dropped them from the TAC." (Defs.' Mem. of P. & A. in Supp. of Mot. to Dismiss TACC ("Mem. of P. & A.") at 2 n.1.) Defendants argue that "those claims for relief should now be dismissed with preju-

dice." (*Id.*) Defendants cite no authority giving the Court the power to dismiss claims already dismissed. The claims at issue are not currently before the Court, hence, the claims cannot be dismissed by this Court. Moreover, any claims raised in a previous complaint and not raised again in the TACC are deemed waived, rendering Defendants' request unnecessary. *See, e.g., Soghomonian v. U.S.,* 82 F.Supp.2d 1134, 1150 (E.D.Cal. 1999).

December 12, 2003, Defendants moved to dismiss the TACC.

### Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). Dismissal of a claim under this Rule is appropriate "only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Navarro,* 250 F.3d at 732 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 534 (9th Cir. 1984); *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law"). Alternatively, a complaint may be dismissed when it presents a cognizable legal theory but pleads insufficient facts under the theory. *Robertson,* 749 F.2d at 534.

 In reviewing a motion to dismiss under Rule 12(b)(6), courts must assume the truth of all factual allegations and construe them in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir.1996). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *W. Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981) *cert. denied,*

454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981). When ruling on a motion to dismiss, courts may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the Court takes judicial notice. *Parrino v. FHP, Inc.,* 146 F.3d 699, 705–06 (9th Cir.1998); *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1989); *MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986).[2]

### Discussion

**I. Failure to State a Claim under Section 10(b) and Rule 10b–5**

**A. Pleading Requirements of Section 10(b) and Rule 10b–5**

In December 1995, Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which mandates that complaints alleging securities fraud comply with the heightened pleading standards of both the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure. *See In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1091 (9th Cir.2002). Failure to meet the heightened pleading requirements is cause for dismissal of the complaint. 15 U.S.C. § 78u–4(b)(3)(A).

 Under Ninth Circuit caselaw, Rule 9(b) imposes two distinct requirements on complaints alleging securities fraud. First, the basic notice requirements of Rule 9(b) require the complaint

---

**2.** Defendants have filed a request asking the Court to take judicial notice of the documents referenced in the Complaint. (Request for Judicial Notice in Supp. of Mot. to Dismiss TACC, Doc. No. 126.) The Court may consider documents relied upon in, but not attached to, the complaint when ruling on a motion to dismiss. *Parrino,* 146 F.3d at 705–06. The Court need not take judicial notice of these

documents. Plaintiffs object to the Court's consideration of Exhibit A and portions of Exhibit H. (Pls.' Opp. to Defs.' Request for Judicial Notice at 1.) However, the Court need not resolve this dispute because it did not rely on the objected to portions of the exhibits in reaching its decision. Accordingly, Defendants' Request for Judicial Notice is **DENIED AS MOOT**.

to "state precisely the time, place, and nature of the misleading statements, misrepresentations, and specific acts of fraud." *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir.1994). The Rule imposes a second requirement that the complaint "set forth an explanation as to why the statement or omission complained of was false and misleading." *Yourish v. California Amplifier*, 191 F.3d 983, 993 (9th Cir.1999) (quoting *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir.1994) (en banc)). A complaint may satisfy this second requirement by "pointing to inconsistent contemporaneous statements or information ... which were made by or available to the defendants." *Yourish*, 191 F.3d at 994 (quoting *In re GlenFed*, 42 F.3d at 1549); *DeMarco*, 149 F.Supp.2d at 1223. A complaint may not, however, demonstrate that a statement was false or misleading when made "merely by pointing to later inconsistent statements or conditions." *In re GlenFed*, 42 F.3d at 1548.

■ Through the PSLRA, Congress clarified and strengthened the particularity requirements of Rule 9(b) as applied in the context of federal securities class action lawsuits. Under the PSLRA, a complaint must identify (1) each statement alleged to have been misleading, (2) the reason or reasons why the statement is misleading, and (3) all facts on which that belief is formed. 15 U.S.C. § 78u–4(b)(1); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 996 (9th Cir.1999). If allegations are made on information and belief, "a plaintiff must provide, in great detail, all the relevant facts forming the basis of her belief. It is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate her claim." *Silicon Graphics*, 183 F.3d at 985. If reports or other writings form the basis of a plaintiff's belief, the plaintiff should mention "the sources of her infor-

mation with respect to the reports, how she learned of the reports, who drafted them, or which officers received them." *Id.* If a complaint relies on unnamed, confidential sources, a person need not be named "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Seebeyond Technologies Corp. Sec. Litig.*, 266 F.Supp.2d 1150, 1158–59 (C.D.Cal. 2003) (citing *Novak v. Kasaks*, 216 F.3d 300, 313–14 (2d Cir.2000)). "To contribute meaningfully toward a 'strong inference' of scienter ... allegations attributed to unnamed sources must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge." *In re Northpoint Communications Group, Inc., Sec. Litig.*, 221 F.Supp.2d 1090, 1097 (N.D.Cal.2002). A complaint should at least include each witness's job title and describe their responsibilities within the Company. *Id.* Exact dates of employment, however, need not be included, as they "would significantly erode the confidentiality of these sources." *In re Seebeyond*, 266 F.Supp.2d at 1159.

■ Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Silicon Graphics*, 183 F.3d at 975 (*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). With regard to this element, the PSLRA requires complaints alleging federal securities fraud to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). As interpreted by the Ninth Circuit, this language requires a private securities plaintiff to plead particular facts that constitute strong circumstantial evidence of deliberately reckless or intentional mis-

conduct. *Silicon Graphics*, 183 F.3d at 977. "[I]f the challenged act is a forward-looking statement, the required state of mind is 'actual knowledge ... that the statement was false or misleading.'" *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp., et al.* (*"Am.West"*), 320 F.3d 920, 931 (9th Cir.2003) (quoting 15 U.S.C. § 78u–5(c)(1)). The court reviews the entire complaint to determine whether the totality of facts and inferences, including inference unfavorable to the plaintiffs, raises a strong inference of scienter. *E.g., Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.2002).

## B. Alleged False and Misleading Statements

### 1. July—September 2000

The TACC alleges four instances between July and September 2000 in which Defendants reportedly made false and misleading statements: (1) on July 12, 2000, JNI announced a certification agreement with Compaq to supply JNI's products to customers (TACC ¶ 55); (2) on July 17, 2000, JNI issued a report claiming "record" second quarter 2000 results and "continued strong demand for JNI's products and its dominate position in the Fibre Channel storage area network sector of the high end market" (*Id.* ¶¶ 56–57); (3) on July 18, 2000, Bear Sterns analysts issued a favorable report based on "Company specific information provided by defendants, specifically Purdy and Flanagan, during a conference call announcing Q200 results" (*Id.* ¶ 58); and (4) on July 18, 2000, an analyst from DLJ issued a favorable report based on information provided by Defendants, "specifically Purdy and Flanagan during the July 17, 2000 conference call announcing Q200 results" (*Id.* ¶ 59). Plaintiffs claim that the first two statements made by JNI were false or misleading because of failure to disclose

material adverse facts. (*Id.* ¶¶ 55, 57). With respect to the two analyst reports, Plaintiffs claim that "both reports repeated false or misleading information to the market that was provided by defendants Purdy and Flanagan and served to artificially inflate JNI's stock price." (*Id.* ¶ 60.)

Plaintiffs allege that many of the false and misleading statements made by Defendants throughout the class period were false not because the facts reported were incorrect, but rather because of failure to disclose contemporaneous, adverse, material information. "Rule 10b–5 and Section 14(e) in terms prohibit *only* misleading and untrue statements, not statements that are incomplete ... To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir.2002).

#### a. July 12, 2000 Announcement of Certification Agreement

The allegedly false or misleading statement made on July 12, 2000, was an announcement that JNI had entered into a certification agreement with Compaq. In its last Order, the Court found that "the description of the July 12 statement ... remains inadequate under the PSLRA because it is unclear which Defendants(s), if any, made or were directly responsible for the statement." (Order II at 8.) Plaintiffs have again failed to plead this allegation with the particularity required by Rule 9(b) and the PSLRA. (*See* TACC ¶ 55.)

Plaintiffs claim that the falsity of this statement is evidenced by Defendants' failure to disclose information about the difficulty JNI was experiencing with its Emerald III product. (TACC ¶¶ 62–63, 65–68.) In order for an omission to mis-

lead, it must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody,* 280 F.3d at 1006. The statement at issue made no representations about the Emerald III product. The Compaq statement did not create any need for Defendants to disclose information about Emerald III. Accordingly, omitting the Emerald information did not render the Compaq announcement misleading.

■ Plaintiffs state that "the announcement was an effort to convince investors that JNI was expanding beyond the Sun Microsystems platform, with an increased emphasis on PCI revenues...." (TACC ¶ 55.) Motive may be used as circumstantial evidence of scienter. *Silicon Graphics,* 183 F.3d at 974. However, even if this allegations of motive were supported by facts identifying the source of Plaintiffs' information, motive does nothing to establish that the statement at issue was false or misleading. Without any allegations supporting the claim that the statement was false or misleading, and that it is attributable to specific defendants, this allegation continues to be inadequate.

#### b. *July 17, 2000, Press Release*

■ The July 17, 2000, press release reported record second quarter for fiscal year 2000 results, "including revenue of $24 million and EPS (before charges of $0.12)." (TACC ¶ 56.) The press release was allegedly "approved by the Individual Defendants as a 'group-published' document,[3] and Purdy was listed as the contact person for the information in the press release." (*Id.*) The press release also quoted Flanagan stating that "the compa-

ny's revenue growth of 30% reflected continued strong demand for its Unix and PC suit of products and the result of the company's aggressive market expansion initiatives," and other positive statements about the demand and expansion JNI was experiencing. (*Id.*)

The press release reported JNI's second quarter earnings. Nowhere in the TACC is it alleged that these earning reports were false. Rather, Plaintiffs cite "Flanagan's statements about continued strong demand for JNI's products and its dominate position in the Fibre Channel storage area network sector of the high end market" as false or misleading because Defendants failed to disclose materially adverse facts. (TACC ¶ 57.) First, Plaintiffs cite information allegedly communicated to JNI from Sun employees as undermining the press release. (*See* TACC ¶ 62.) The inadequacy of the Sun allegation has been addressed in the Court's previous orders. In short, it has not been alleged that the omission of the Sun information "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." *Brody,* 280 F.3d at 1006. The press release made no mention of Sun, and Plaintiffs have failed to plead fact that would establish, if true, that the Sun information meant that the state of affairs was materially different from that expressed in the press release. In addition, the allegation fails to plead scienter because no facts suggest that any of the defendants were privy to this information prior to the issuance of the press release.

Next, Plaintiffs cite alleged problems with the Emerald III software as material-

---

**3.** The TACC alleges that the press release was approved as a "group published" document. (TACC ¶ 56.) Defendants argue that the group publish doctrine does not apply under the PSLRA. (Defs.' Reply at 8 n.4.) The Court

need not address this dispute because Plaintiffs have failed to establish that any statements made in the press release were false or misleading.

ly adverse information that Defendants omitted, rendering the press release misleading. Attempting to establish that the Emerald III information constituted material, adverse, contemporaneous information, the Complaint cites information from Virgilio Baterina, JNI's Asia Pacific Manager (TACC ¶ 63), emails to and from Purdy (TACC ¶ 65), and sales and marketing data documenting the Emerald products (TACC ¶ 67). However, Plaintiffs still fail to "describe, chart or graph" the alleged decline in demand. *See Ronconi v. Larkin,* 253 F.3d 423, 431 (9th Cir.2001). Plaintiffs do not dispute the 30% revenue growth or the 50% backlog that JNI experienced in the second quarter. (*See* TACC ¶ 56.) These facts give strong support for the positive statements made by Flanagan. Without more information, the omission of problems with one product line does not suggest that the positive statements made by Flanagan were false or misleading.

Plaintiffs also allege that the July 17, 2000, press release was false or misleading because Defendants failed to disclose the existence of a structure called the "Office of the President." (TACC ¶¶ 69–70.) Plaintiffs allege that with the creation of this group, Flanagan, JNI's President and CEO, was "effectively ousted from power." (TACC ¶ 69.) The group was allegedly formed sometime in Mid–June. (*Id.*) Flanagan remained President and CEO until he retired in November 2000. (TACC ¶ 117.) As Defendants note, the parties involved with this committee were already intimately involved in running the company by virtue of their positions. Gregory was the Chief Operating Officer. (TACC ¶ 25(c).) Purdy was the Chief Financial Officer. (TACC ¶ 25(b).) McKnett was the Chief Technology Officer. (TACC ¶ 25(d).) These three defendants were among the most powerful officers in the company. It is not unusual for officers other than the CEO to report to the Board. It is not unusual for other employees to report to them. Plaintiffs cite these developments as evidence of "major changes in senior management," however, the facts pled do not establish that these functions were out of line with those expected to be performed by senior officers, which is what Purdy, Gregory, and McKnett were. Plaintiffs claim that this alleged shift in power constituted usurpation rather than mere delegation. Yet, the facts cited fail to support this claim. No information is provided suggesting that the tasks performed by the committee were not appropriately undertaken by officers of Purdy, Gregory, and McKnett's stature in the company.

Even if Plaintiffs were able to establish that this information should have been disclosed, they fail to establish why this alleged change in management renders the information in the July 2000 press release false or misleading. Plaintiffs do not explain how failing to disclose the existence of the Office of the President "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." *Brody,* 280 F.3d at 1006. Defendants correctly state that "there is no dispute that until he resigned in November 2000, Flanagan remained JNI's CEO and president and retained all legal responsibility and liabilities that accompany those positions." (Defs.' Mem. of P. & A. at 10.) Flanagan was liable for his statements quoted in the press release. No allegations suggest that the projections made by Flanagan would be negatively impacted by this committee's existence. Failure to disclose the Office of the President did not render the statements in the press release false or misleading.

### c. July 18, 2000, Bear Stearns and DLJ Analyst Reports

In July 18, 2000, analysts from Bear Stearns and DLJ issued reports on

JNI "based on Company specific information provided by defendants, specifically Purdy and Flanagan, during a conference call announcing Q200 results." (TACC ¶¶ 58, 59.) The reports repeated the information from the conference call to the markets. Plaintiffs state that "both reports repeated false or misleading information to the market that was provided by defendants Purdy and Flanagan and served to artificially inflate JNI's stock price." (TACC ¶ 60.) There continue to be many significant problems with this allegation of fraud.

 Plaintiffs have not pled facts necessary to hold Defendants liable for the analysts' reports. An insider defendant can be liable for analysts' reports if the defendant either (1) makes false or misleading statements to analysts "with the intent that the analysts communicate those statements to the market," *Cooper v. Pickett,* 137 F.3d 616, 624 (9th Cir.1997); or (2) puts his or her imprimatur on the analysts' statements. *In re Syntex Corp. Sec. Litig.,* 95 F.3d 922, 934 (9th Cir.1996). Because Plaintiffs have not alleged that any of the defendants endorsed the analysts' public statements, it appears that Plaintiffs contend that Defendants are liable under the first theory. However, even under the first theory, Plaintiffs' allegations fall short of the PSLRA's requirements. First, the Complaint alleges that the facts contained in the analysts' reports were false or misleading for the same reasons that the July 17, 2000, press release was false or misleading. The factors cited—the information from Sun; the problems with Emerald; the existence of the Office of the President—fail to contradict the information provided by the reports. Plaintiffs fail to dispute the facts stated in the reports. The projections made the by analysts were based on apparently accurate representations made by Defendants. The omission of these facts during the conference call did not "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." *See Brody,* 280 F.3d at 1006.

The allegations discussing the analysts' reports also fail because they are not pled with the particularity required by Rule 9(b) and the PSLRA. Plaintiffs allege that "[b]oth the Bear Stearns and DLJ reports factored into their earnings models the expected growth of the PCI-based revenues that defendants Purdy and Flanagan were telling them to expect in future quarters." (TACC ¶ 60.) The allegations do not suffice because they fail to identify the content of statements made by specific Defendants. *See In re Secure Computing Corp. Sec. Litig.,* 184 F.Supp.2d 980, 990 (N.D.Cal.2001) (plaintiffs adequately pled liability for analyst report under *Cooper* theory by identifying defendant's false statement to analysts, their locations, the speakers, the content of the statements, and the specific time and place it was made).

The Court finds that allegations concerning the analyst reports are inadequate under the PSLRA and Rule 9(b) because they fail to (i) identify what statements were made by which Defendants to the analysts, or (ii) establish that the statements made were false or misleading.

### 2. October 2000

The TACC alleges four instances during October 2000 when Defendants allegedly made false or misleading statements in order to artificially inflate JNI's stock prices prior to the October 19, 2000, Secondary Offering. The statements were made (1) in an October 16, 2000, press release announcing JNI's third quarter results, (2) during an October 16, 2000, conference call with investors, analysts and media representatives, (3) during a roadshow to promote the Offering in early October, and (4) in the October 19, 2000,

prospectus issued in connection with the Offering. (*See* TACC ¶¶ 73, 74, 76, 78.) Plaintiffs allege that the statements made in the prospectus and on the roadshow were false or misleading because the defendants failed to disclose adverse facts set forth in the Complaint in paragraphs 80 through 92. (*Id.* ¶¶ 76, 79.) The statements made in the October 16, 2000, press release and conference call were allegedly false or misleading because of the same factual allegations. (*Id.* ¶ 73.) Below, the Court will consider the impact of the factual allegations that Plaintiffs claim show that false or misleading statements were knowingly or recklessly made during October 2000.

██ First, however, the Court must address Plaintiffs' identification of their sources. The source of Plaintiffs' information about the alleged October fraud is omitted in almost every instance. Plaintiffs make a general statement that "[t]he information in ¶¶ 80–92 is based on interviews with former JNI employees, internal JNI documents and testimony from other JNI-related litigation." (*Id.* ¶ 93.) A similar statement is made about the facts alleged in paragraph 97 of the Complaint. (*Id.* ¶ 97.) The PSLRA's heightened pleading rules require that a plaintiff identify the source of her information. If reports or other writings form the basis of a plaintiff's belief, the plaintiff should mention "the sources of her information with respect to the reports, how she learned of the reports, who drafted them, or which officers received them." *Silicon Graphics*, 183 F.3d at 985. If a complaint relies on unnamed, confidential sources, a person need not be named "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Seebeyond Technologies Corp. Sec. Litig.*, 266 F.Supp.2d at 1158–59. "To contribute meaningfully toward a

'strong inference' of scienter ... allegations attributed to unnamed sources must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge." *In re Northpoint Communications Group, Inc. Sec. Litig.*, 221 F.Supp.2d at 1097. A complaint should at least include each witness's job title and describe their responsibilities within the Company. *Id.* Accordingly, Plaintiffs' general statements fall far short of identifying sources with the particularity required by the PSLRA. Below, the Court will consider the source of allegations made by Plaintiffs without regard to this general statement because it does nothing to help establish the source of their information.

### a. October 16, 2000, Press Release and Conference Call

██ In the October 16, 2000, press release, JNI reported its third quarter fiscal results. The release also included a statement from Flanagan stating that he expected "continued expansion in revenues" from JNI's FibreStar PCI HBAs. (TACC ¶ 73.) During a conference call made on the same day, Purdy and Flanagan allegedly made statements, listed by Plaintiffs, regarding the fiscal results during the third quarter and making positive projections about quarter four. (*Id.* ¶ 74.) Plaintiffs assert that these statements were false or misleading. (*Id.* ¶ 73.) As in the previous complaints, Plaintiffs do not dispute any of the numbers reported by Defendants in either the press release or the conference call. Rather, they point to facts that they claim were contemporaneous, adverse, and material, and thereby made the positive statements made by Defendants false or misleading.

First, Plaintiffs cite the Green Sheet meetings during which Defendants allegedly received information about the fiscal

health of the company. Defendants were allegedly informed at the October 24, 2000, meeting "that because of a slowdown in orders, JNI would not be able to meet its Q400 growth rate of 18–20%." (TACC ¶ 80.) There is no allegation in the Complaint stating that this was true as of October 16, 2000, the date of the press release and conference call. Moreover, because it was allegedly given to Defendants more than a week after October 16, 2000, this information fails to establish that the statements made on October 16, 2000, were knowingly or recklessly false or misleading when made. In addition, the allegations about the Green Sheet meetings are made on information and belief and, consequently, must be pled with particularity sufficient to suggest that the source had reason to know this information. *See Vantive*, 283 F.3d at 1087; *Silicon Graphics*, 183 F.3d at 985. The Complaint describes the meetings and alleges that Defendants or their representatives were always in attendance. However, the source of this information is not identified.

Next, Plaintiffs point to reports that showed that total revenue would be flat sequentially from Q300 and that there was a decrease in demand compared to what investors expected in Q400. (TACC ¶¶ 82–83.) As established above, what investors expected as a result of analysts reports cannot create liability for corporate officers unless the *Cooper* test is met. The 18–20% projected growth rate for fourth quarter 2000 was established by analysts, not Defendants. (*See id.* ¶ 74.) Purdy did state on the conference call that she was "comfortable" with the analysts' expectations. (*Id.* ¶ 74.) However, "[s]uch statements have been routinely found by courts to be non-actionable puffery because they are soft expressions of optimism and not a guarantee of performance." *In re Securities Litigation BMC Software, Inc.*, 183 F.Supp.2d 860, 891–92 (S.D.Tex.2001); *see also Raab v. General Physics Corp.*, 4 F.3d

286, 291 (4th Cir.1993) ("statement that results 'should be in line with analysts' current projections' hardly constitutes a guarantee that earnings would be forthcoming in particular amounts; this forecast, like the others, lacks the specificity necessary to make it material.") In addition, the Complaint fails to adequately identify the "master 'roll up' document" cited as the source of this information. *Silicon Graphics*, 183 F.3d at 985 (holding that if reports or writings form the basis of plaintiff's belief, the plaintiff should mention "the sources of her information with respect to the reports, how she learned of the reports, who drafted them, or which officers received them").

Plaintiffs also claim that Defendants were informed as early as September 2000 by Orenich that there was a "possibility" that JNI might not meet the projected growth rate for Q400. (TACC ¶ 84.) Again, Defendants are not responsible for the projected growth rate issued by analysts. In addition, Orenich's statement that there was "a possibility" that JNI would not meet its projected revenues does not suggest that Defendants' had actual knowledge that the statements they made in October were false or misleading, as required to establish liability for forward looking statements. *See Am. West*, 320 F.3d at 931.

Next, Plaintiffs point to the sales team's alleged growing awareness of the weakness in demand for JNI products. (TACC ¶ 85.) The Complaint alleges again here that Sun employees reported to JNI engineering employees that demand would be declining. (*Id.*) First, as the Court addressed above, this allegation fails to establish the falsity because there is no explanation of why the Sun information would render any statements made by Defendants false or misleading. Also, the allegation fails to establish scienter be-

cause nowhere is it alleged that any of the defendants ever received this information. Plaintiffs also allege that JNI's biggest customer, EMC, was not requesting as many orders as projected. (*Id.*) However, the Complaint fails to allege the time frame for this decline, what impact this decline had on revenue or projected growth, or when and how Defendants became aware of this information. The Complaint also states that "the sales team was not closing any large sales and was failing to expand JNI's customer base. As a result of these developments and the expected slowdown in growth, internal budgets were cut drastically in October 2000." (TACC ¶ 85.) Again, these are vague allegations that Plaintiffs fail to quantify. There is no information provided about why these allegations contradicts any of the October 16, 2000, disclosures. Moreover, no details are provided about the source of this information.

The Complaint alleges that one former employee remembers an announcement at an October meeting attended by each Defendant that "demand and new orders were decreasing because he was responsible for purchasing the materials that JNI needed to make its product." (TACC ¶ 86.) While this allegation comes closer to alleging facts with particularity, it fails to establish that any statements made by Defendants were false. The primary deficiency with this allegation, identified in the Court's first Order, still exists. (*See* Order I at 13.) Plaintiffs' failure to identify the date on which this announcement was made defeats the allegation. The probative value of this announcement rises or falls based on whether it was made before or after the allegedly false statements. Without this critical information, the fact that an announcement was made in October is insufficient to show the falsity of any statements made or to raise a "strong inference that defendants acted intentionally or with deliberate recklessness," both

of which are required showings under the PSLRA *See Silicon Graphics,* 183 F.3d at 974–75.

Next, Plaintiffs attempt to establish the falsity of the October 16, 2000, statements by claiming that "the sales team felt that JNI should go public and announce that they would not meet earnings expectations. However, Purdy was vehemently opposed to any disclosure." (TACC ¶ 87.) First, this allegation is insufficient because the Complaint fails to identify its source. Moreover, the TACC fails to allege that any of the defendants ever made any predictions about future earnings expectations in October. As established above, Purdy's vague statement that she was "comfortable" with the analysts' expectations is nonactionable puffery. *See In re Securities Litigation BMC Software, Inc.,* 183 F.Supp.2d at 891–92. The allegation is also insufficient because it fails to plead facts with the particularity required by the PSLRA. Plaintiffs fail to allege when and how the sales team communicated its opinions to Purdy or how and when she expressed her alleged opposition to disclosure. In addition to not establishing that any of October 16, 2000, statements were false or misleading, the allegation also fails to establish scienter. The sales team's concern does not establish that Purdy *knew* that JNI was going to do worse than she publicly represented. *See Am. West,* 320 F.3d at 931 (holding that "if the challenged act is a forward-looking statement, the required state of mind is 'actual knowledge . . . that the statement was false or misleading' ").

Plaintiffs assert that the October 16, 2000, statements made by Defendants were knowingly false because JNI was allegedly losing business to Emulex. (TACC ¶¶ 88–89.) The Complaint alleges that the "increasing competition from Emulex was one of the major concerns and

frequent topics at the Company's weekly meetings." (TACC ¶ 88.) Here, again, Plaintiffs fail to allege the source of this information. They also fail to provide any details about its significance. When an allegation is pled on information and belief, the complaint must state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u–4(b)(1); *see Desaigoudar v. Meyercord,* 223 F.3d 1020, 1022–23 (9th Cir.2000). The simple fact that Emulex's "increasing competition" was a concern to JNI does not contradict any of the statements made by Defendants on October 16, 2000.

The next factual allegation pled to show that the October 16, 2000, statements were false or misleading has to do with JNI's projected revenues for the third quarter of 2000. Plaintiffs cite a report, the September Monthly Reporting Package, that stated that PCI/Emerald revenues were only 2.3% of the revenues for that month and that SBUS/Emerald revenues were $1.1 million below budget. (TACC ¶ 90.) However, as Defendants highlight, the Complaint does not allege that the budget or forecast for Emerald sales referred to were ever disclosed to the public.

Moreover, Plaintiffs selectively quote from the September Monthly Reporting Package they cite.[4] Plaintiffs cite the two areas in the report in which JNI was performing below expectation. They fail to report that "SBUS Tachyon exceeded budget by $4.9 million ... PCI Tachyon was $785k above budget ... Overall for the quarter, revenues were $30.0 million exceeding the budget by $3.5 million. We exited September 2000 with backlog at $14.8 million compared to $12.2. million at 8/31/00." (Defs.' Ex. H at 485.) The facts from this report cited by Plaintiffs do not directly contradict any of the information released on October 16, 2000. Furthermore, given the existence of the positive information found in the report, the omission of the negative numbers in the October statement did not give the impression of a state of affairs materially different from the one that existed. *See Brody,* 280 F.3d at 1006. According to the report, the deficiencies cited by Plaintiffs were made up for by the greater-than-expected revenues in other areas. The information cited from the Monthly Reporting Package fails to establish that Defendants communicated false or misleading information to the public.

Lastly, if reports or other writings form the basis of a plaintiff's belief, the plaintiff must state "the sources of her information with respect to the reports, how she learned of the reports, who drafted them, or which officers received them." *Silicon Graphics,* 183 F.3d at 985. None of this information is provided in the Complaint with respect to the September Monthly Reporting Package.

Next, Plaintiffs point to the Hitachi allegations to show that the October 16, 2000, statements were fraudulent. Plaintiffs allege that one week prior to the offering, Defendants were aware that Hitachi, "one of their major OEM customers," was not endorsing their products. (TACC ¶ 91.) Plaintiffs claim that "defendants were aware that Hitachi had issued a directive not to purchase any JNI PCI cards, with the effect of shutting off all PCI sales by JNI to Hitachi." (*Id.*) Plaintiffs claim that this information was set forth in an email written by Wenaas and sent to Stiska, Flanagan and Purdy. (*Id.*) The Complaint also alleges that Defendants considered disclosing this information, but decided against disclosure "because of the potential

---

4. The Court may consider the contents of this document in its analysis because it has been incorporated by reference into the TACC. *Parrino v. FHP, Inc.,* 146 F.3d 699, 705–06 (9th Cir.1998).

negative impact such disclosure of this material adverse fact would have on the Offering." (*Id.*)

These allegations are insufficient because they are not pled with the particularity required by the PSLRA. First, Plaintiffs fail to state "the sources of [their] information with respect to the reports, [and] how [they] learned of the reports...." *Silicon Graphics,* 183 F.3d at 985. It also fails provide any detail about the claim that Defendants considered, and then decided against, disclosure. No information is provided about the basis or source for Plaintiffs' belief that this occurred. *See id.; (see also* Order II at 15.)

In addition, the Hitachi allegations continue to have the same defects identified in the Court's previous orders. (*See* Order I at 14; Order II at 15.) Plaintiffs have not remedied the fact that they "have not pled facts indicating that [the Hitachi] problem would necessarily result in material losses for JNI." (Order II at 15.) The Court finds, once again, that "alleging that the problem with Hitachi could have a 'potential negative impact' is too vague for purposes of proving falsity" under the PSLRA. (*Id.*) These allegations remain inadequate.

Plaintiffs claim that "JNI was not making a smooth transition from Sun-based products to PCI products sold for all platforms." (TACC ¶ 92.) Plaintiffs claim that "JNI was experiencing severe production and product development problems. All of the defendants were aware of these critical problems as further demonstrated by the e-mails below." (*Id.*) The Complaint then quotes passages from nine emails sent to and from Defendants. The emails state, among other things, "EMC has stopped testing Emerald—sounds like they have almost thrown us out. This is a very grave concern to the mgmt team—I think the team is concerned that the company is slipping" (*Id.* ¶ 92(a)); "Let's hope we're through our production challenges by spring. I just finished an update with Tom. I think we're still under some serious production and product problems overall" (*Id.* ¶ 92(d)); "Marketing and Sales have lost all confidence in Engineering[']s ability to deliver product ... We have made unrealistic commitments to customers we shouldn't have" (*Id.* ¶ 92(i)). The press release and conference call statements discussed JNI's expectation of increased development and sales of PCI products. The press release stated, "we expect continued expansion in revenues from [the PCI] product group." (*Id.* ¶ 73.) During the conference call, Flanagan stated that "JNI expected the PCI Emerald product to be approved by OEM's 'within the next quarter.'" (*Id.* ¶ 74.) Purdy stated that "inventory levels increasing was not a concern because JNI was expecting 'over the next several quarters ... higher volume shipments of Emerald PCI products.'" (*Id.*)

In its last Order, the Court identified a number of deficiencies with the claims regarding these allegations of production problems, mainly stemming from the vagueness of the allegations. Plaintiffs have attempted to cure these deficiencies with the addition of the emails, but the problems still exist. First, the emails discuss the problems with the Emerald PCI products. However, JNI also sold Tachyon PCI products. Defendants explain this (Defs.' Mem. of P. & A. at 22), and Plaintiffs do not disagree. Nor is there any allegation in the Complaint that contradicts this. In addition, no information is provided quantifying the significance of the problems JNI was having with Emerald PCI products. While the statements in the emails show that the company was experiencing some problems, Plaintiffs fail to explain how the information in the email makes the statements made publicly by Defendants about the PCI products false

or misleading. The critiques stated in the Court's previous Order still apply:

> the pleadings do not "explain the significance of obtaining OEM certification, or indicate how many OEM certifications would be 'enough' to effect a 'smooth transition' to PCI products." March 26, 2003 Order at 14. Further, Plaintiffs have again failed to allege facts demonstrating that the difficulties with the PCI products group were so severe that Defendants knew on October 16, 2000 that the products would not be accepted or certified some time during fourth quarter 2000.

(Order II at 16.) These emails suggest that some people at JNI were concerned, in some cases very concerned, about the problems the company was experiencing. However, what is missing is an explanation of why these particular problems contradicted the public statements made by Defendants. The allegations fail because Plaintiffs have not alleged why the information cited means that the October 16, 2000, statements were false or misleading.

In addition to the above, the Complaint includes an additional allegation to support scienter for allegedly false statements made in October. Plaintiffs allege that "as a result of its decline in business, defendants were attempting to sell JNI to ... Emulex ... Any disclosure of JNI's true business conditions would jeopardize any potential deal." (TACC ¶ 89.) With this allegation, Plaintiffs attempt to show another motive for Defendants' failure to disclose the alleged problems the company was having. However, mere motive is insufficient to establish "a strong inference of deliberate recklessness." *Silicon Graphics*, 183 F.3d at 974. Moreover, while motive can serve as some evidence of intent, it does nothing to establish that Defendants' statements were false. Plaintiffs have failed to establish that any of the statements made on October 16, 2000, were false or misleading, hence this allega-

tion of motive to lie or mislead is irrelevant.

### b. October 19, 2000, Prospectus

 Plaintiffs claim that the prospectus issued on October 19, 2000, contained false or misleading statements because it stated that there was "strong demand for Solaris storage connection products" and "strong sequential sales of PCI products." (TACC ¶ 79.) Plaintiffs claim that these statements were fraudulent because Defendants failed to disclose the adverse developments outlined above and set forth in the Complaint in paragraphs 80–92. However, these factual allegations fail to establish the falsity of the statements in the prospectus for the same reasons that they failed to establish the falsity of the October 16, 2000, statements. As the Court has discussed in detail above, the factual allegations in paragraphs 80 through 92 are insufficiently pled: they fail to adequately identify their sources or quantify the significance of the production problems JNI was experiencing. The productions problems discussed related to the Emerald PCI products, hence the general statement made in the prospectus that JNI was experiencing "strong sequential sales of PCI products" is not contradicted by this information. Without information about the significance of the Emerald problems, the Court cannot conclude that this statement was false or misleading. Plaintiffs have failed to allege facts that show that PCI sales, as a whole, were weak. Similarly, the facts alleged fail to contradict the statement that "strong demand for Solaris storage connection products" existed. Plaintiffs have not established the falsity of the statements found in the prospectus

### c. October 2000 Roadshow

 Plaintiffs allege that during the October 2000 "roadshow," some of the de-

fendants met "institutional investors and money and portfolio managers, and made very favorable presentations about JNI. During these roadshow presentations, in connection with JNI's offering, defendants failed to disclose the adverse facts set forth in ¶¶ 80–92, but instead represented that JNI's business was strong and would be showing significant sequential growth." (TACC ¶ 76.) In its last Order, the Court determined that "these vague allegations are virtually identical to those in the FACC and remain inadequate to plead falsity or scienter under Rule 9(b) and the PSLRA for the reasons stated in the Court's March 26, 2003, Order." (Order II at 17.) This statement applies with equal force to the allegations found in the TACC. As discussed in detail above, Plaintiffs do not claim that any of the numbers stated by Defendants were false. And, the facts pled by Plaintiffs fail to establish that the general, positive statements made by Defendants during the roadshow, or any other time in October, were false or misleading.

#### d. *October Analyst Reports*

On October 24, 2000, Salomon Smith Barney issued a report based on conversations with "JNI senior management (Purdy and Flanagan)." (TACC ¶ 94.) On October 25, 2000, Bear Stearns issued a report on JNI allegedly based on conversations with "JNI management (Purdy and Flanagan)." (TACC ¶ 95.) Both reports raised their estimates for future revenue and made generally positive statements about the state of the company. The Complaint states, "the statements made [in these reports] were false and misleading for the reasons set forth in ¶¶ 62–63, 65–70 and 80–92." (TACC ¶ 96.) These allegations are inadequate to establish fraud because they fail to identify the content of statements made by specific Defendants. *See In re Secure Computing Corp. Sec. Litig.*, 184 F.Supp.2d 980, 990

(N.D.Cal.2001)(plaintiffs adequately pled liability for analyst report under *Cooper* theory by identifying defendant's false statement to analysts, their locations, the speakers, the content of the statements, and the specific time and place it was made). The Complaint claims that the reports were based upon information from Purdy and Flanagan, but gives no specific information about what representations Purdy and Flanagan made about the current state of the company or its future prospects.

In their opposition, Plaintiffs argue, "[a]s one analyst reported, defendants told analysts that '[o]rder rates accelerated through the third quarter and into the fourth, providing a solid start to the December quarter.' This was a flat-out lie." (Pls.' Opp. to Defs.' Mot. to Dismiss TACC ("Pls.' Opp.") at 17 (quoting TACC ¶ 94).) Yet, the Complaint does not allege that this information came from any of the Defendants. Nor does it provide any of the detailed information required by the Ninth Circuit to hold insiders liable for analyst statements. These allegations are far too vague to meet the heightened pleading requirements of Rule 9(b) and the PSLRA. No concrete information is pled showing that the third quarter results and fourth quarter projections *made by Defendants* were "flat-out lie[s]." In addition, as discussed with respect to the other October statements, the fact that JNI was having difficulties with some of its products fails to establish that the statements made in the reports were false or misleading. The information provided by Plaintiffs about JNI's sales and production difficulties is too vague to establish that the disclosures were misleading or false or to establish a strong inference that Defendants acted with the necessary state of mind.

### e. Purdy's October 30, 2000, Emails

██ The Complaint cites two emails written by Purdy as evidence of Defendants' awareness of JNI's problems. (TACC ¶ 97.) These emails were written on October 30, 2000, a week or two after the alleged false statements. In the emails, Purdy wrote, "this quarter is not looking so great—Sxxx," and "So this says we have a high risk of missing the street revenue and EPS numbers—and given the pushout on Friday of Polaris adaptors in the next quarter, I think it just got worse." (*Id.*) Plaintiffs contend that these statements show that Defendants were aware that the projections for the fourth quarter and fiscal year 2001 would not be met. (*Id.*) As discussed above, Plaintiffs have not alleged that the projections discussed internally were disclosed to the public by JNI, let alone any of the Defendants. Moreover, the statements made by Purdy in the emails are too vague to suggest that any of the concrete numbers provided *by Defendants* in October were false or misleading. Lastly, the statements in the emails simply are not negative or concrete enough to undermine JNI's earlier disclosures. The emails contain speculative statements detached from any concrete information about what they would mean even if they came to fruition. The emails fail to establish that any of Defendants' October statements were false or misleading.

### f. October Conclusion

Plaintiffs question "how much more information do you need other than the overall number ($30 million) to understand that there was a real sales shortfall at that time?" (Pls.' Opp. at 18.) The PSLRA requires quite a bit more than this single figure. The facts presented by Plaintiffs, even if they were adequately documented and supported, which most of them are not, simply fail to show that the problems that JNI was experiencing were significant enough to render the statements made in October 2000 false or misleading. Plaintiffs do not directly challenge the numbers represented by Defendants during that month. Rather, they point to the alleged existence of contemporaneous material adverse facts that Defendants failed to disclose. However, without any explanation how these facts contradicted the statements made by Defendants, the October statements continue to be supported by the positive numbers that Plaintiffs do not challenge. The omitted facts do not establish that Defendants "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." *Brody,* 280 F.3d at 1006.

By not providing any information about the significance of the problems they allege, Plaintiffs fail to identify the reason or reasons why the statements at issue are false or misleading. *See* 15 U.S.C. § 78u–4(b)(1). In addition, for many·of the allegations, Plaintiffs do not identify their sources with the detail required under the PSLRA. *See Silicon Graphics,* 183 F.3d at 985. In sum, the TACC fails to establish that any of the October statements were false or misleading.

### 3. November 2000 Statements

██ The allegations of false or misleading statements made in November 2000 are substantially the same as those made in the Second Amended Complaint. The at-issue statements were made in a Form 10–Q filed on November 9, 2000, a press release issued on November 10, 2000, a statement Purdy made that was quoted in a November 11, 2000, news article, and a prepared statement for a conference call issued on November 13, 2000. (TACC ¶¶ 99–106.) The Court will not list all the statements made in these documents because the Complaint quotes large

blocks of text from these documents that take up multiple pages. In addition, the Court's previous Order summarizes the allegedly false statements made in these documents. (Order II at 17–18.) The Court now turns to the factual allegations that Plaintiffs claim show that Defendants' November 2000 statements were false or misleading.

First, Plaintiffs argue that the November statements were false or misleading "for the reasons set forth in ¶¶ 62–63, 65–70 and 80–92 above and ¶¶ 108–114 below." (TACC ¶ 107.) Above, the Court has established that the factual allegations found in paragraphs 62–63, 65–70 and 80–92 fail to establish falsity of any of the October statements. This analysis applies equally to the November 2000 statements. Again, the problems highlighted in these paragraphs are not put into any context that would allow the Court to conclude that, if true, they show that the November statements were false or misleading.

In paragraph 108, Plaintiffs argue that the "entire business was deteriorating rather than 'business as usual' as defendants told investors and analysts on the conference call. JNI's sales team was still arguing with defendants, in particular Purdy, regarding JNI's failure to inform investors that [fourth quarter 2000] estimates provided by defendants to analysts would not be obtained and revenues would be $40 million instead of $34–36 million." (TACC ¶ 108.) No where in the Complaint is there any allegation that supports Plaintiffs' claim that the "entire business was deteriorating." No where in the Complaint is there any allegation that Defendants provided analysts with estimates of fourth quarter revenues. In addition, Plaintiffs provide no support for their claim that the sales team was still, or ever, arguing with Defendants regarding disclosures. These allegations fail to establish

the falsity of any of the November 2000 statements.

In paragraph 109, Plaintiffs claim that "the statement about increased demand for JNI's products was clearly false or misleading ...." (TACC ¶ 109.) Again, Plaintiffs have failed to show that the statement about increased demand, on the whole, was not true. They have simply alleged that JNI was having problems with some products without explaining the significance of these problems. Next, Plaintiffs allege that "the statement about Flanagan remaining as a consultant was false or misleading because defendants were negotiating an exit package for Flanagan which would hasten his exit from JNI." (*Id.*) Nothing in the Complaint suggests that, as of November, Flanagan was not intending to stay on as a consultant. The emails cited by Plaintiffs in paragraphs 69 and 70 in the Complaint simply establish that Flanagan was planning to retire as CEO and President of JNI. This information is consistent with the November disclosure. Nothing in the emails cited in the Complaint contradict JNI's announcement that Flanagan intended to provide consulting services to the company.

Plaintiffs also contend that Waddington's statement that Flanagan would remain a member of JNI's Board was false or misleading because of these emails. (TACC ¶¶ 115–16.) The portions of the emails quoted in the Complaint only reference Flanagan's status as CEO and President of the Company and make no mention of his status as a board member. In fact, the Complaint alleges that Flanagan remained on the board for approximately two and a half months after he relinquished his positions as CEO and President. (*Id.* ¶ 25(a).) Hence, nothing in the Complaint establishes that as of November 27, the date Waddington made the statement, the statement was false or mislead-

ing. Most significantly, Waddington is not a defendant in this case. Even if his statement were fraudulent, Plaintiffs have pled nothing to suggest that his statement is attributable to any of the defendants.

In Paragraph 110, Plaintiffs claim that "defendants knew that JNI would not be able to meet earnings estimates for [fourth quarter 2000 and fiscal year 2001] as previously represented to investors in the October 16, 2000 conference call and November 13, 2000 conference call." (TACC ¶ 110.) Paragraphs 111, 112, and 113 are intended to show that Defendants were aware of the "[fourth quarter 2000] revenue miss." (*Id.* ¶ 111.) The earning estimates to which these allegations refer were analyst generated. Plaintiffs have not pled facts that establish Defendants' liability for them. Also, as the Court found in its last Order and finds applicable to the TACC, "the Court is unable to locate any statement in November 2000 in which Defendants purported to project earnings for future revenues, other than soft statements of general optimism," which constitute non-actionable puffery. (Order II at 19.)

Next, the allegation of the "illegal transaction" that Purdy attempted to orchestrate is identical to the allegation found in the Second Amended Complaint. (*Compare* TACC ¶ 114 *with* SACC ¶ 60(e).) Plaintiffs assert that the information found in this paragraph, as well as the six other paragraphs discussed in this section "is based on interviews with former JNI employees, internal JNI documents and testimony from other JNI-related litigation." (TACC ¶ 114.) Plaintiffs have failed to correct the deficiency with this allegation identified in the Court's last Order: "Plaintiffs have again failed to describe these sources with sufficient particularity—they neither name the former employees nor identify specific internal reports, pleadings, or other court documents."

(Order II at 19 (citing *Silicon Graphics,* 183 F.3d at 985).)

For the foregoing reasons, Plaintiffs have failed to establish that Defendants' November 2000 statements were false or misleading.

#### 4. December 2000 Statements

On December 11, 2000, JNI issued a press release announcing its fourth quarter fiscal year 2000 results. (TACC ¶ 117.) Plaintiffs claim that "when the market opened on December 11, 2000, investors were shocked that rather than the expected 18–20% sequential growth, JNI might post flat to 15% sequential growth ... The market's reaction to the news ... is a clear indicator that the market was not previously aware of the negative information known by defendants since mid-October 2000." (TACC ¶ 118, 120.) A report issued by Bloomberg quoted a JNI spokesman stating "revenue may be lower because the company's customers who install storage networks may see a slowdown in business." (TACC ¶ 119). The Complaint also discusses two analyst reports issued in December addressing these disclosures. (TACC ¶¶ 121, 122.)

Plaintiffs claim that the December statements described above did not constitute "a full disclosure of JNI's business problems. Defendants failed to disclose that fiscal year 2001 revenues would not be growing sequentially and fiscal year 2001 results would be significantly lower than estimates. Defendants also failed to disclose that JNI was failing to obtain OEM certificates for its key PCI-based products, and that it was accumulating excess inventory due to the continued deterioration of its business." (TACC ¶ 123.) These allegations are identical to those made in the Second Amended Complaint. (*Compare* TACC ¶ 123 *with* SACC ¶ 68.) In its Order dismissing the Second Amended Com-

plaint, the Court held, with respect to these allegations of falsity,

> [n]one of these facts establish that JNI's December 11, 2000 press release were false or misleading. Plaintiffs do not allege, for instance, that the figures reported by Purdy [in the December 11, 2000, press release] were false. Moreover, their allegation that FY01 results would be 'significantly lower than estimates' is inadequate because, as discussed above, Plaintiffs have not alleged sufficient facts to demonstrate that Defendants are responsible for the analysts' estimates.

(Order II at 20.) This analysis applies with equal force to the TACC allegations. The Complaint does not allege that Defendants' December statements were false or misleading.

### 5. January 2001 Statements

On January 24, 2001, JNI issued another press release reporting its fourth quarter 2000 and fiscal year 2000 results. (TACC ¶ 124.) The allegations regarding this press release are similar to those found in the two previous versions of the Complaint. Plaintiffs claim that the press release was false for two reasons.

First, the TACC claims that "[t]hese results were falsified by JNI's failure to write down $7.7 million in excess inventory of product, such as the Emerald III product that was in excess supply ...." (*Id.* ¶ 125.) Plaintiffs have included text from the *Accounting Research Bulletin* that they claim establishes that the failure to take a write down was a violation of General Accepted Accounting Principles ("GAAP"). (*Id.* ¶ 126 n. 5.) It is not clear from the facts pled that Defendants made any false or misleading statements as a result of a GAAP violation. The Bulletin, quoted by Plaintiffs, states "in accounting for inventories, a loss should be recognized whenever the utility of goods is impaired by damages, deterioration, obsolescence,

changes in price levels, or other causes." (*Id.* ¶ 126 n. 5.) Plaintiffs allege that JNI "was left with excess product in the fourth quarter." (*Id.* ¶ 126.) There is no claim in the Complaint that the utility of the product at issue was "impaired by damages, deterioration, obsolescence, changes in price levels, or other causes." The facts pled do not show that GAAP required JNI to take the write down in the fourth quarter of 2000.

In addition to not establishing falsity, the GAAP allegation also fail to establish scienter. Failure to follow GAAP, by itself, does not fulfill the scienter requirement. *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 387 (9th Cir.2002). In order for alleged GAAP violations to establish scienter, the complaint must allege facts indicating "that [the defendant] knew or must have been aware of the improper revenue recognition, [or] intentionally or knowingly falsified the financial statements[.]" *Id.* at 390–91. The allegation is inadequate because it does not allege facts raising a "strong inference" that Purdy knew that the write-down should have been taken in the fourth quarter of 2000. The Complaint alleges, "conversations with Purdy discussing when this excess inventory should be written down took place during the weekly Green Sheets meeting in late 2000 and early 2001. Purdy decided that the Company should wait until a later quarter to take the write-down." (TACC ¶ 127.) These allegations fail to establish that Purdy knew or must have been aware that the write-down should have take place in the fourth quarter of 2000. As Defendants correctly note, "Plaintiffs do not even allege that those conversations resulted in the conclusion that a write down was required." (Defs.' Mem. of P. & A. at 32.) Considering the facts alleged by Plaintiffs and Plaintiffs' own representation of the GAAP, the

Court cannot conclude the failure to take a write down constituted a GAAP violation, let alone one that Purdy was aware of at the time.

The allegations regarding the claimed GAAP violation also fail to identify adequately the source of this information. As has been stated above, simply stating that this information is "based on interviews with former JNI employees and testimony from other JNI-related litigation" is insufficient to identify the source of this information with particularity, as required by the PSLRA. *Silicon Graphics,* 183 F.3d at 985.

The second set of facts that Plaintiffs claim rendered the information in the press release false is the alleged improper deal known as the Barney Deal: "the [fourth quarter 2000] results were also falsified by one million in falsified revenue in a fabricated deal between JNI, Hitachi and Sun Microsystems." (TACC ¶ 125.) As the Court stated in its previous Order, "Plaintiffs do not allege facts that indicate that JNI did not, in fact, purchase a computer from Sun or sell adapters to Hitachi. Enclosing the word 'sold' in quotation marks in insufficient to demonstrate exactly what transpired between these companies or describe how and why this transaction falsified revenues." (Order II at 22.) Plaintiffs have not cured this deficiency, hence the Barney Deal allegation continues to be inadequate to establish that the January 2001 statements were false or misleading.

### C. Insider Trading Allegations

 Plaintiffs once again allege that Defendants engaged in suspicious insider trading during the class period. "If insiders owning much of a company's stock make rosy characterizations of company performance to the market while simultaneously selling off all their stock for no apparent reason, their sales may support inferences both that their rosy characterizations were false and that they knew it." *Ronconi v. Larkin,* 253 F.3d 423, 434–35 (9th Cir.2001). However, unusual or suspicious stock sales by corporate insiders constitute circumstantial evidence of scienter only if the trading is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from the undisclosed inside information." *Silicon Graphics,* 183 F.3d at 986 (quoting *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989)). In evaluating whether insiders' stock sales are unusual or suspicious, courts consider "(1) the amount and percentage of shares sold by insiders, (2) the timing of the sales, and (3) whether the sales were consistent with the insider's prior trading history." *Silicon Graphics,* 183 F.3d at 986. Another factor meriting consideration is whether the insider had any limitations on his or her ability to trade. *Am. West,* 320 F.3d at 938. In the present action, the TACC alleges that a total of more than 1 million shares were sold by Defendants Flanagan, Purdy, Gregory, McKnett, Wenaas, and Stiska during the Class Period for gross proceeds exceeding $59 million. (TACC ¶ 136).

 Defendants' stock sales, as alleged in the TACC, still do not raise a strong inference of scienter. As established in the Court's last order, the percentage of stocks sold by Defendants Flanagan, Gregory and McKnett (20.76%, 21.36%, 27.25%) are not suspicious, given that Plaintiffs have failed to link these stock sales to any misleading or false statements. *See Vantive,* 283 F.3d at 1094 (holding that an insider's sale of 26% was not "terribly unusual or suspicious, given the complaint's failure to connect [defendant's] sales with any particular allegedly misleading statements"). Similarly, the Complaint's allegations with regard to Defen-

dant Purdy remain unchanged. While she sold a large percentage of her available stock holdings (98.48%), her sales fail to raise suspicion because they are consistent with prior trading activity. *See Am. West,* 320 F.3d at 938 (holding that "insider stock sales are only suspicious when they are dramatically out of line with prior trading practices"). Prior to the class period, Purdy sold 100% of her available stocks, hence her class period sales are not "dramatically out of line with prior trading practices."

The Court acknowledges now, as it did in its previous Order, that the sales of Defendants Wenaas and Stiska (98.80% and 85.44%) raise suspicion. In its Order dismissing Plaintiffs' Second Amended Complaint, the Court held that even though these percentages raised suspicions, Plaintiffs had

> not provided the Court with sufficient information to determine the significance of the new percentages. For example, Plaintiffs do not indicate how much stock each Defendant received in the Jaymark distribution, and how much of that stock was sold. The SACC only indicates the stock sales during the Class period which could include already owned stock as well as newly obtained stock.

(Order II at 24–25.) Plaintiffs have attempted to remedy this deficiency by providing the Court with information about when Defendants obtained their JNI stock.

Interestingly, Flanagan, Gregory and McKnett all received relatively small percentages of their shares through the July 24, 2000, reorganization. (TACC ¶¶ 134, 135.) On July 13, 2000, Flanagan held 615,750 shares of JNI common stock, Gregory held 309,066 shares, and McKnett held 132,586 shares. (TACC ¶ 134.) As a result of the July 24, 2000, Jaymark liquidation, Flanagan received 532,298 shares, Gregory received 30,736 shares, and McKnett received 43,814 shares. (TACC ¶ 135.) In stark contrast, Wenaas and Stiska, the two Defendants with suspicious percentage sales during the class period, received the vast majority of their JNI stock pursuant to the July 24, 2000, reorganization. On July 13, 2000, Wenaas held 6,027 shares of JNI stock and Stiska held 3,850 shares. (TACC ¶ 134.) As a result of the Jaymark liquidation, Wenaas received 2,241,377 shares of JNI stock and Stiska received 171,176 shares. (TACC ¶ 135.) The fact that Wenaas and Stiska, alone, obtained the vast majority of their stock from the liquidation rebuts the presumption of suspicion created by simply looking at the percentages out of context. The numbers provided by Plaintiffs, in fact, provide a reasonable explanation for why these two Defendants sold such high percentages of their stock during the class period compared with their earlier sales; they, and only they, received the majority of their JNI stock during the class period. Far from being suspicious, it makes sense that their pre-class period sales would be far lower than their class period sales, unlike the sales pattern of other Defendants whose pre and post class percentages are less divergent.

Plaintiffs also claim that the sales of all Defendants are suspicious because they were limited by lock-up agreements. "As such, defendants sold virtually all they could sell from the shares they acquired in the Jaymark liquidation." (Pls.' Opp. at 30.) However, the lock-up agreement, as explained in the Complaint, did not limit the Defendants' ability to sell stocks during the Secondary Offering. It only limited their ability to sell after the Offering.

> The agreement provided that the previously distributed Jaymark shares not sold in an offering were subject to a lock-up period of 180 days from the date of the offering ... The previously distributed Jaymark shares not sold in the

Secondary Offering, and subject to the lock-up agreement, would not be available for the Individual Defendants to sell until after the close of the Class Period.

(TACC ¶ 137.) The Complaint also states, "[p]ursuant to lock-up agreements, the former Jaymark shareholders were only allowed to sell a portion of their JNI holdings in the Secondary Offering, with the remaining shares restricted from sale for at least six months." (*Id.* ¶ 4.) The lock-up agreement as described by Plaintiffs would not have limited Defendants' stock sales during the Secondary Offering. Accordingly, it is not clear what Plaintiffs wish the Court to consider when they argue, "the Court should examine what defendants' sales were in context with what they could legally sell according to the lock-up agreements." (Pls.' Opp. at 30.) The Complaint does not state that there was any limit on what Defendants could sell during the Secondary Offering. Plaintiffs claim that "they sold nearly *all* of their shares that they could sell in the Secondary Offering pursuant to the lock-up agreement" (*id.*), but Plaintiffs provide no information to support this conclusory allegation. The lock-up agreement allegations fail to suggest that Defendants' sales were suspicious.

The timing of the sales still undermines any inference of suspiciousness, even with respect to Defendants Purdy, Wenaas and Stiska, as the Court explained in detail in its last Order. (*See* Order II at 25.) Defendants' sales occurred well below the peak price. *See Vantive*, 283 F.3d at 1093–94 (noting that there was no strong inference of scienter where the majority of shares sold between $20 and $24 per share and the stock price increased for several months, peaking at $39 per share); *Ronconi*, 253 F.3d at 435 (finding that no strong inference existed where insiders "miss[ed] the boat" by selling shares for $53 to $56 per share, although the price peaked at

$73 per share). JNI's stock peaked at $126 per share in November of 2000. (*TACC* ¶ 98.) As the Court held in its Order dismissing the FACC, "here the defendants 'missed the boat'" by selling stock for between $42 and $70 when the peak price reached $126. (Order I at 23.)

Plaintiffs add an allegation to this Complaint that Defendants' trading violated JNI's internal policies. (TACC ¶ 141.) To support this claim, Plaintiffs cite a portion of a memo explaining JNI's insider trading policy. (*Id.*) Plaintiffs fail to plead facts that establish that the internal policy was violated. More importantly, even if the internal policy was violated, this does nothing to overcome the Court's conclusion that Defendants' stock sales are not suspicious.

### D. Looking at the Complaint in Its Entirety

As stated above, courts must consider allegations of scienter collectively in order to determine whether scienter has been alleged with sufficient particularity. *Broudo v. Dura Pharmaceuticals, Inc.*, 339 F.3d 933, 940 (9th Cir.2003) (remanding case to district court to perform final step of considering the complaint's allegations as a whole). "Beyond each individual allegation [courts] consider whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *Am. West*, 320 F.3d at 938 (quotations omitted). As instructed by the Ninth Circuit, the Court must view the Complaint in its entirety to determine whether scienter has been sufficiently alleged.

There is one remaining allegation of scienter that the Court must address before considering the Complaint in its entirety. Plaintiffs allege that "Defendants' scienter is further reflected in a

May 23, 2002, sworn declaration by Hugo Santos, the former vice president of JNI's human resources department, in his wrongful termination against JNI...." (TACC ¶ 19.) The declaration states that Purdy and Gregory asked Mr. Santos to destroy documents and lie to SEC investigators "reviewing 'option transactions' for the period prior to JNI's re-setting it's [sic] fourth quarter guidance on December 11, 2000 and about information provided to Wall Street and investors during the conference call." (*Id.*) The portion of the declaration quoted provides additional details about the nature of the demands allegedly made by Purdy and Gregory. The problem with Plaintiffs' use of the Santos declaration is that it does not establish scienter for any of the false statements alleged in the Complaint. It is not adequately linked to any of the allegedly false statements made by Defendants.

Before a Court may conclude that Defendants made false statements with the "mental state embracing intent to deceive, manipulate, or defraud," it must first find that Defendants made false or misleading statements. Plaintiffs have failed to sufficiently allege that any representations made by Defendants were false or misleading. To the contrary, allegations in the Complaint justify many of the statements made by Defendants. Plaintiffs fail to contest any of the financial data disclosed by Defendants during the class period, much of which apparently accurately represented the condition of the company. Looking at the Complaint as a whole reveals an attempt to establish "fraud by hindsight," which is exactly what the PSLRA was designed to prevent. *See Vantive*, 283 F.3d at 1084–85. Without establishing falsity, the allegations of scienter are not enough to establish that the statements at issue here constituted fraud.

### E. Conclusion

Plaintiffs have made three attempts to adequately plead their case for securities fraud against Defendants. The previous two complaints were dismissed in lengthy orders issued from this Court detailing their deficiencies. The third complaint fails to remedy the problems identified in the Court's two previous orders. Again, Plaintiffs have not alleged sufficient facts to demonstrate that Defendants knowingly or recklessly made false or misleading statements.

## II. Failure to State a Claim for Control Person Liability

██ Plaintiffs assert theories of "control person" liability over Defendants Flanagan, Purdy, and Wenaas under § 20 of the 1934 Act, 15 U.S.C. § 78t(a). (TACC ¶¶ 20, 148.) However, because Plaintiffs have failed to state a claim for primary liability under the 1934 Act, these claims must also be dismissed. *See Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir.1999).

### *Conclusion*

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss Plaintiffs' Third Amended Consolidated Complaint. In its previous Order, the Court cautioned Plaintiffs that they would receive no future opportunities to amend their pleadings. Accordingly, the TACC is **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**