Jules BRODY;  Joyce T. Crawford,
Plaintiffs–Appellants,

v.

TRANSITIONAL HOSPITALS CORPO-
RATION;  Wendy L. Simpson;  Richard
L. Conte, Defendants–Appellees.

No. 99–15672.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 11, 2001.

Filed Feb. 7, 2002.

Mark R. McDonald, Morrison & Foerster, Los Angeles, CA, for the defendants-appellees.

Before: HALL, WARDLAW and BERZON, Circuit Judges.

BERZON, Circuit Judge.

In this case we address several securities fraud issues, centering on whether a plaintiff must have traded at about the same time as the insider it alleges violated securities laws. Jules Brody and Joyce T. Crawford brought suit against Transitional Hospital Corporation ("THC" or "the company") and its officers claiming violations of the Securities and Exchange Act of 1934 ("Exchange Act") and state law because the defendants both traded in reliance on inside information and released misleading public information. The district court granted the defendant's motion to dismiss for failure to state a claim. Brody and Crawford now appeal the district court's order on several grounds.

## BACKGROUND

In determining whether the complaint states a claim upon which relief could be granted, we assume the facts alleged in the complaint to be true. *Ronconi v. Larkin,* 253 F.3d 423, 427 (9th Cir.2001). The facts alleged in the complaint are as follows:

THC was a Nevada corporation that delivered long-term acute care services through hospitals and satellite facilities across the United States. In August 1996, the company announced its plan to buy back from time to time on the open market up to $25 million in company

Jeffrey S. Abraham, New York, NY, for the plaintiffs-appellants.

stock. Two months later, THC expanded the repurchase plan to $75 million.

On February 24, 1997, Vencor, Inc. submitted to THC's board of directors a written offer to acquire the company for $11.50 per share. THC did not disclose this offer publicly. Between February 26 and February 28, THC purchased 800,000 shares of its own stock at an average price of $9.25 per share. This $7.4 million buyback was in addition to another $21.1 million that THC had spent purchasing its stock in the three month period that ended on February 28, 1997. The plaintiffs do not allege that the total repurchase exceeded $75 million.

THC issued a press release on March 19, 1997, detailing the progress and extent of its stock repurchase program. The press release did not mention Vencor or any other party's interest in acquiring THC. The plaintiffs argue that because of this omission, the March press release was misleading.

On April 1, 1997, Vencor increased its offer to purchase THC to $13 per share. In the next few weeks, THC also received offers from two other competing bidders. On April 24, after receiving all three offers, THC issued another press release, stating that the company had "received expressions of interest from certain parties who have indicated an interest in acquiring" it. The same document also stated that THC had hired "financial advisers to advise the company in connection with a possible sale." The plaintiffs argue that this press release was also misleading, because it did not state that substantial due diligence had already taken place, that THC had received competing offers exceeding $13 per share, or that a THC board meeting would take place two days later to consider these offers.

At the board meeting, the THC board voted to negotiate a merger agreement with Select Medical Corporation ("Select"). On May 4, THC publicly announced that it and Select had entered into a definitive merger agreement and that Select would purchase THC at $14.55 per share. Vencor thereupon threatened a hostile takeover. To fend off that maneuver, THC ultimately agreed, on June 12, to a takeover by Vencor rather than Select, at $16 per share.

Brody and Crawford sold shares at times that sandwich the April 24 press release. Two days before that press release was issued, Crawford sold 500 shares at $8.875 per share. Brody sold 3,000 shares of THC stock at $10.50 per share on April 24, just after the press release was made public. The plaintiffs argue that had they not been misled by THC, they would have held onto their shares, and benefitted from their subsequent increase in value.

Brody and Crawford filed a class action complaint against THC and its officers on August 28, 1997. In addition to alleging violations of Nevada state law, Brody and Crawford alleged violations of Sections 10(b), 14(e), and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(e), and 78t(a), and Rules 10b–5 and 14e 3, 17 C.F.R. §§ 240.10b–5 and 240.14e–3, promulgated thereunder by the Securities Exchange Commission ("SEC"). These claims focus on two aspects of THC's course of action: Brody and Crawford accuse the company of illegal insider trading because THC repurchased 800,000 shares of its stock between February 26 and February 28 without first disclosing that Vencor and other parties had expressed interest in THC. In addition, Brody and Crawford claim that THC, in its March 19 and April 24 press releases, materially misled them about THC's progress toward its eventual merger.

The district court dismissed all of Brody and Crawford's claims. In so doing, the district court held that Brody and Crawford are not proper parties to assert any insider trading claims, as Brody and Crawford did not trade contemporaneously with THC. In addition, the district court decided that the plaintiffs failed to state a claim under Rule 10b–5 or any other law based on materially misleading information, as the press releases were not misleading under the applicable standards.

The plaintiffs appeal these aspects of the district court's dismissal. We review de novo the district court's dismissal for failure to state a claim pursuant to Federal Rule of Procedure Rule 12(b)(6). *Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir.2001).

## DISCUSSION

### A. Insider Trading

As they pertain to insider trading, Section 10(b), Rule 10b–5, Section 14(e) and Rule 14e–3 make it illegal in some circumstances for those possessing inside information about a company to trade in that company's securities unless they first disclose the information. *See, e.g., United*

States v. Smith, 155 F.3d 1051, 1063–64 (9th Cir.1998). This type of prohibition is known as an "abstain or disclose" rule, because it requires insiders either to abstain from trading or to disclose the inside information that they possess.

The district court dismissed the insider trading claims, holding that the named plaintiffs could not assert them because they did not trade contemporaneously with THC. On appeal, Brody and Crawford argue that nothing in the applicable securities laws requires investors to have traded contemporaneously with insiders in order to maintain a suit for insider trading. In addition, they argue that even if such a requirement exists, they in fact did trade contemporaneously with THC.

### 1. Section 10(b) and Rule 10b–5

Neither section 10(b)[1] nor Rule 10b–5[2] contain an express right of action for private parties. The Supreme Court has held, however, that proper plaintiffs may sue for damages for violation of the statute and rule. *See Superintendent of Ins. v. Bankers Life and Cas. Co.*, 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Because neither the statute nor the rule

---

1. Section 10, in relevant part, states:

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

   .     .     .     .     .

   (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm–Leach–Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

2. Rule 10b–5 states:

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

   (a) To employ any device, scheme, or artifice to defraud,

   (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

   (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

contains an express right of action, they also do not delineate who is a proper plaintiff. In the absence of explicit Congressional guidance, courts have developed various "standing" limitations, primarily on policy bases.[3]

For example, in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Supreme Court held that to bring an insider trading claim under Rule 10b–5, a plaintiff must have traded in the same stock or other securities as the insider trader. The contemporaneous trading requirement, at issue in this case, is another judicially-created standing requirement, specifying that to bring an insider trading claim, the plaintiff must have traded in a company's stock at about the same time as the alleged insider.

██ In *Neubronner v. Milken*, 6 F.3d 666, 669 (9th Cir.1993), the Ninth Circuit adopted a contemporaneous trading requirement for Section 10(b) and Rule 10b–5 actions. *See also In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427 (9th Cir.1994). *Neubronner* explained that two reasons animate this rule: First, "noncontemporaneous traders do not require the protection of the 'disclose or abstain' rule because they do not suffer the disadvantage of trading with someone who has superior access to information." 6 F.3d at 669–70 (quoting *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 94 95 (2d Cir.1981)). Second, the contemporaneous trading requirement puts reasonable limits on Section 10(b) and Rule 10b–5's reach; without such a limitation, an insider defendant could be liable to a very large number of parties. *Id.* at 670.

Brody and Crawford offer two reasons why the contemporaneous trading rule adopted in *Neubronner* should not here apply. First, they argue that the rule does not make sense, as a matter of statutory interpretation. In other words, they request that we declare that *Neubronner's* interpretation of Section 10(b) and Rule 10b–5 was incorrect. Although the decision in *Neubronner* is not beyond debate, we do not consider the question further, as a Ninth Circuit panel may not overrule a prior Ninth Circuit decision. *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir.2001).

Brody and Crawford attempt to avoid this precedential barrier by claiming that *Neubronner's* implementation of the contemporaneous rule was dictum, and therefore not binding on us. It was not. *Neubronner* explicitly described its ruling regarding the contemporaneous trading requirement as a "holding." 6 F.3d at 670. In addition, the determination was a necessary predicate for the case's ultimate conclusion that contemporaneous trading must be pleaded with particularity. *Id.* at 673.

Brody and Crawford's second submission in avoidance of *Neubronner* is that *United States v. O'Hagan*, 521 U.S. 642, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997), overruled *Neubronner*. That assertion is simply wrong. *O'Hagan*, which was a criminal case, addressed neither the contemporaneous trading requirement in private actions nor any other standing rule. Instead, by approving of an expansive concept of who qualifies as an insider under Section 10(b), the Supreme Court in *O'Hagan* clarified that more *defendants* may be liable under Section 10(b) than some courts have previously thought. *Id.* at 650, 117 S.Ct. 2199. In so doing, the

---

**3.** These "standing" limitations are not, of course of the constitutional variety, grounded in Article III of the Constitution, but simply delineate the scope of the implied cause of action.

Supreme Court did not alter pre-existing notions concerning whom insiders harm when they trade based on privileged information.

■ Brody and Crawford next argue that even if the Section 10(b) and Rule 10b–5 contemporaneous trading requirements remain, the court should define contemporaneous trades as trades that take place within six months of one another. Under this definition, Brody and Crawford would have standing, as they sold their stock just under two months after they allege THC bought the large block of stock in February.

■ In *Neubronner*, this court did not decide the length of the contemporaneous trading period for insider trading violations under Section 10(b) and Rule 10b–5, 6 F.3d at 670, nor has this court decided the question since. Because the two-month time period presented by the facts of this case exceeds any possible delineation of a contemporaneous trading period, it is not necessary in this case either to define the exact contours of the period. We simply note that a contemporaneous trading period of two months would gut the contemporaneous trading rule's premise—that there is a need to filter out plaintiffs who could not possibly have traded with the insider, given the manner in which public trades are transacted.

### 2. Section 14(e) and Rule 14e–3

Brody and Crawford also argue that the district court erred in dismissing their claims under Section 14(e)[4] and Rule 14e–3[5] by holding that insider trading actions brought under Section 14(e) and Rule 14e–3 must also conform to a contemporaneous trading requirement. In making this argument, the plaintiffs urge that we hold for them on two matters of first impression: (1) whether a private right of action exists under Rule 14e–3; and (2) if a private right of action does exist, whether it contains a contemporaneous standing requirement. We can assume, without deciding, that a private right of action exists under Rule 14e–3, for we see no reason

4. Section 14(e) states:
It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

5. Rule 14e–3(a) states:
(a) If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the "offering person"), it shall constitute a fraudulent, deceptive or manipulative act or practice

within the meaning of section 14(e) of the Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from:
(1) The offering person,
(2) The issuer of the securities sought or to be sought by such tender offer, or
(3) Any officer, director, partner or employee or any other person acting on behalf of the offering person or such issuer, to purchase or sell or cause to be purchased or sold any of such securities or any securities convertible into or exchangeable for any such securities or any option or right to obtain or to dispose of any of the foregoing securities, unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise.

why the same contemporaneous trading rule that applies under Rule 10b–5 would not apply in such an action.

■ As noted, this court has definitively adopted a contemporaneous trading requirement under Rule 10b–5. Although Rule 14e–3 differs in some respects from Rule 10b–5, (and was adopted in order to plug some holes the SEC perceived in Rule 10b–5),[6] its core, like the core of Rule 10b–5, is an "abstain or disclose" requirement. And, as is true of the "abstain or disclose" requirement of Rule 10b–5, the similar requirement of Rule 14e–3 is designed to prevent the disadvantage that inheres in trading with an insider with superior access to information. 45 Fed. Reg. 60411–12 (1980). So we would have to have some excellent reason to adopt a different standing rule under Rule 14e 3 from the one we use under Rule 10b–5. We are convinced that there is no basis for drawing such a distinction.

The best candidate appellants have advanced as a basis for differentiating the standing requirement under the two Rules is *Plaine v. McCabe*, 797 F.2d 713 (9th Cir.1986). *Plaine* held that a plaintiff suing under Section 14(e) need not have traded at all, let alone contemporaneously. *Id.* at 718.

The fulcrum of *Plaine* was a distinction suggested by *Piper v. Chris–Craft Indus.,* *Inc.*, 430 U.S. 1, 38–39, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), between the types of shareholder protections contained in Sections 10(b) and 14(e): *Piper* noted that while Section 10(b) was enacted to protect only individuals who actually traded in stocks, Section 14(e) can be understood as protecting not only those who buy or sell stocks but also shareholders who decide not to trade. 430 U.S. at 38–39, 97 S.Ct. 926. Because Rule 14e–3 was promulgated under Section 14(e), the argument that a plaintiff who alleges insider trading under Section 14(e) or Rule 14e–3 need not worry about the contemporaneous trading requirement—because he need not have traded at all—has some initial plausibility.

On a closer examination, however, *Plaine* does not speak to the issue at hand. Rather, *Plaine* focused only on *non*-insider trading claims brought under Section 14(e), and did not consider the standing requirements for an insider trading claim brought under Rule 14e–3.

Section 14(e) broadly prohibits "fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer;" it does not contain any specific reference to insider trading. Rule 14e–3, on the other hand, focuses on one type of behavior, insider trading, whose prohibition is thought to prevent fraudulent, deceptive, or manipulative acts.[7] *See O'Ha-*

---

**6.** *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), considered, but did not decide, the viability of a misappropriation theory of liability under Rule 10b–5. 445 U.S. at 235–37, 100 S.Ct. 1108. (A misappropriation theory extends liability to some parties who trade in a company's securities on the basis of confidential information but who have no special relationship with the company's shareholders.) Following *Chiarella,* the SEC promulgated Rule 14e–3, which clearly creates liability for insiders who trade in connection with a tender offer and do not disclose the inside information, regardless of their relationship to the

shareholders *or* the source of the information. Then in 1997, the Supreme Court decided *O'Hagan,* answering the question left open by *Chiarella* and deciding that Section 10(b) and Rule 10b–5 do create liability under a misappropriation theory. 521 U.S. at 650, 117 S.Ct. 2199. The upshot is that Rules 10b–5 and 14e–3 largely overlap with regard to the scope of insider trader liability, although they differ in some respects not here pertinent. *See* p. 1004, *infra.*

**7.** As we discuss below, in *O'Hagan* the Supreme Court approved Rule 14e–3 as a pro-

*gan,* 521 U.S. at 672–73, 117 S.Ct. 2199. In accordance with its specific, prophylactic focus, Rule 14e–3 applies to a different set of behaviors than does Section 14(e): Section 14(e) centers on the actual tender offer, whereas Rule 14e–3 regulates illegal insider trading that takes place while a tender offer is under consideration. As appellants' brief states, "[a]ll the elements of a Section 14(e)/Rule 14e–3 insider trading violation are supplied by the language of Rule 14e–3."

A comparison of the facts in *Plaine* with the facts in this case illustrates the difference between the Section 14(e) claim considered in *Plaine* and the Rule 14e–3 claim considered here. Plaine held shares in a company subject to a tender offer. She complained that false information in proxy materials had induced other shareholders to tender their shares. Because so many other shareholders tendered their shares, the merger went through at a price Plaine viewed as inadequate. Although Plaine did not tender her shares, the court ruled that she alleged injury occurring as a result of fraudulent activity in connection with a tender offer and had standing to assert her claim. 797 F.2d at 717. Plaine did not, however, allege insider trading, and therefore could not have made out a claim under Rule 14e–3.

Brody and Crawford, on the other hand, did allege insider trading but did not allege that THC manipulated the tender offer process through the use of false information or by any other means. As such, the facts in the current case present a very different situation than that presented in *Plaine.* The circumstances do, however, bear a much closer resemblance to those in *Neubronner,* a Rule 10b–5 case centering around accusations of insider trading in violation of an abstain-or-disclose requirement. *See Neubronner,* 6 F.3d at 667.

Despite the similarities of the issues here and in *Neubronner* and between Rules 10b–5 and 14e–3, as applied to insider trading allegations, Brody and Crawford emphasize the differences between the Rules. Unlike Rule 10b–5, Rule 14e–3 does not require proof that a person traded on information obtained in violation of a duty owed to the source of the inside information. Instead, Rule 14e–3(a) creates a duty for a person with inside information to abstain or disclose "without regard to whether the trader owes a pre-existing fiduciary duty to respect the confidentiality of the information." *O'Hagan,* 521 U.S. at 669, 117 S.Ct. 2199 (quoting *United States v. Chestman,* 947 F.2d 551, 557 (2d Cir.1991) (en banc)). Although Rule 14e–3 thus expands the notion of who is an insider, it does not follow that the Rule also expands the class of shareholders who may complain when an insider trades without disclosing insider information. As a result, the fact that Rule 10b–5 and Rule 14e–3 are not identical does not lead to the conclusion that one has a contemporaneous trading requirement and the other does not.

More importantly, perhaps, in *this* case, the allegation is that THC traded in its own stock on the basis of inside information. Such allegations would state a " 'traditional' or 'classical' theory of insider trading liability [under] Rule 10b–5 based on 'a relationship of trust and confidence . . . between the shareholders of a corporation and those insiders who have obtained information by reason of their position with that corporation.' " *O'Hagan,* 521 U.S. at 651–652, 117 S.Ct. 2199 (quoting *Chiarella,* 445 U.S. at 228, 100 S.Ct. 1108). As such, this case is one that could be— and indeed, was—brought under both Rule 10b–5 and Rule 14e–3, and as to which any

phylactic rule designed to prevent core viola-

tions of Section 14(e). *See* p. 1004, *infra.*

differences between the two rules regarding the necessary relationship between the insider and the source of information is not relevant.

Brody and Crawford note another reason that, they argue, suggests an expansive reading of Rule 14e–3 is appropriate. In *O'Hagan,* the Supreme Court ruled that the SEC is permitted to promulgate rules under Section 14(e), such as Rule 14e–3, that prohibit acts not themselves fraudulent under the common law if the rules are reasonably designed to prevent acts that are. 521 U.S. at 671–73, 117 S.Ct. 2199. This authority derives from the prophylactic rule-making power granted to the SEC by Section 14(e), a power that has no parallel in Section 10(b). *Id.*

That the SEC had more power to protect investors when it promulgated Rule 14e–3 than it did when it promulgated Rule 10b–5 does not mean, however, that the SEC exercised that power so as to protect noncontemporaneous traders under Rule 14e–3. And, in fact, what evidence there is demonstrates that the SEC did not intend to protect investors who could not have possibly traded with the insiders.

In *O'Hagan,* the Supreme Court quoted at length from and afforded deference to the SEC's explanation of why it promulgated Rule 14e–3. Part of the Federal Register excerpt quoted in *O'Hagan* stated:

> The Commission has previously expressed and continues to have serious concerns about trading by persons in possession of material, nonpublic information relating to a tender offer. This practice results in unfair disparities in market information and market disruption. Security holders who purchase from or sell to such persons are effectively denied the benefits of disclosure

and the substantive protections of the [legislation that includes Section 14(e) ]. 521 U.S. at 674, 117 S.Ct. 2199 (quoting 45 Fed. Reg. 60412 (1980)).

This quotation evinces a particular concern for those who "purchase from or sell to" insiders, and suggests that these shareholders, and not others who trade later, are the intended beneficiaries of Rule 14e–3. The contemporaneous trading requirement, designed to limit the class of potential plaintiffs to only those who could have possibly traded with the insider, is therefore precisely congruent with the SEC's expressed purpose in promulgating Rule 14e–3.

In sum, Rule 10b–5 and Rule 14e–3 contain similar insider trading prohibitions, triggered by similar concerns. While Rule 14e–3 focuses on the tender offer context, the background history and language of Rule 14e–3 indicate that the Rule does not alter the premise that a shareholder must have traded with an insider or have traded at about the same time as an insider to be harmed by the insider's trading. We conclude that there is no principled distinction between Rules 10b–5 and 14e–3 as regards the need for a contemporaneous trading allegation.

We therefore extend the contemporaneous trading requirement to insider trading actions brought under Section 14(e) and Rule 14e–3 actions. Because Brody and Crawford traded nearly two months after they allege THC traded, they did not trade contemporaneously with THC. The district court was correct in dismissing their Rule 14e–3 insider trading claims.

**B. Misrepresentation**

We next consider a different set of concerns addressed by the securities laws: Rule 10b–5 and Section 14(e)'s explicit prohibition against the making of untrue or misleading statements. The plaintiffs do

not maintain that either press release issued by THC was untrue. They do argue, though, that THC violated the prohibitions against making misleading statements when it issued the two press releases here at issue. In order to survive a motion to dismiss under the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA"), the plaintiffs' complaint must specify the reason or reasons why the statements made by THC were misleading. 15 U.S.C. § 78u–4(b)(1); *see also Ronconi*, 253 F.3d at 429.

As an initial matter, Brody and Crawford correctly assert that a statement that is literally true can be misleading and thus actionable under the securities laws. *See In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1551 (9th Cir.1994). But they err when they argue that in order for a statement not to be misleading, "once a disclosure is made, there is a duty to make it complete and accurate." This proposition has no support in the case law.

■■■ Rule 10b–5 and Section 14(e) in terms prohibit *only* misleading and untrue statements, not statements that are incomplete. Similarly, the primary case upon which Brody and Crawford rely for their innovative completeness rule supports only a rule requiring that parties not mislead. *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1098 n. 7, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). Often, a statement will not mislead even if it is incomplete or does not include all relevant facts.[8] Further, a completeness rule such as Brody and Crawford suggest could implicate nearly all public statements potentially affecting securities sales or tender offers. No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been

disclosed but were not. To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists. *See McCormick v. The Fund American Cos.*, 26 F.3d 869, 880 (9th Cir.1994).

We conclude that neither Rule 10b–5 nor Section 14(e) contains a freestanding completeness requirement; the requirement is that any public statements companies make that could affect security sales or tender offers not be misleading or untrue. Thus, in order to survive a motion to dismiss under the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA"), the plaintiffs' complaint must specify the reason or reasons why the statements made by THC were misleading or untrue, not simply why the statements were incomplete. 15 U.S.C. § 78u–4(b)(1); *see also Ronconi*, 253 F.3d at 429.

■■■ Brody and Crawford's allegations do not comport with this requirement. They allege, first, that the press release issued on March 19 was misleading because it provided information about THC's stock repurchase program but did not contain information regarding THC's possible takeover. Although Brody and Crawford specify what information THC omitted, they do not indicate why the statement THC made was misleading. If the press release had affirmatively intimated that no merger was imminent, it may well have been misleading. The actual press release, however, neither stated nor implied anything regarding a merger.

■■■ Brody and Crawford also claim that THC's second press release, issued on

---

**8.** For example, if a company reports that its sales have risen from one year to the next, that statement is not misleading even though it does not include a detailed breakdown of the company's region by region or month by month sales.

April 24, was misleading. Again, the plaintiffs do not argue that the press release was untrue. Instead, they argue that it was misleading because it stated generally that THC had received "expressions of interest" from potential acquirers, when in fact it had received actual proposals from three different parties. Importantly, the complaint does not provide an explanation as to why this general statement was misleading, nor is it self-evident that it was.

A proposal is certainly an "expression of interest." Moreover, the press release did not simply state that there had been vague "expressions of interest;" it went on to state that the "expressions" were "from certain parties who have indicated an interest in acquiring either the entire company or in acquiring the company, with the company's shareholders retaining their pro rata interests in Behavioral Healthcare Corporation [a THC subsidiary]." This specificity concerning the nature of the parties' proposals certainly suggests that something more than preliminary inquiries had taken place.

Further, the press release additionally stated that the "Board of Directors has engaged financial advisors to advise the company in connection with a possible sale." This additional information again suggested proposals that were concrete enough to be taken seriously. And the reference to multiple parties contained in the press release suggests an ongoing auction for THC was taking place with at least two participants.

In short, the press release did not give the impression that THC had *not* received actual proposals from three parties or otherwise mislead readers about the stage of the negotiations. Instead, although the press release did not provide all the infor-

mation that THC possessed about its possible sale, the information THC did provide—and the reasonable inferences one could draw from that information—were entirely consistent with the more detailed explanation of the merger process that Brody and Crawford argue the press release should have included. Put another way, Brody, if he read the press release, would have been on notice, before he sold his shares, of the distinct possibility that the value of the shares would increase in the near future because of a takeover contest.[9]

■ Because Brody and Crawford have not alleged facts indicating that THC's April 24 press release was misleading, the district court properly dismissed that aspect of the plaintiffs' complaint.

## CONCLUSION

Brody and Crawford have not met the contemporaneous trading requirements necessary to have standing in the insider trading claims they assert. Additionally, they have failed properly to allege misrepresentation against THC. As a result, we affirm the district court's decision to dismiss Brody and Crawford's complaint for failure to state a claim upon which relief could be granted.

**AFFIRMED.**

---

**9.** We note that Crawford sold his shares before the April 24 press release, so he could not have been influenced in his trading by the release.