**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| RETAIL WHOLESALE & DEPARTMENT STORE UNION LOCAL 338 RETIREMENT FUND, | No. 14-16433 |
| *Plaintiff-Appellant*, | D.C. No. 3:12–cv–04115–JST |
| v. | OPINION |
| HEWLETT-PACKARD CO. and MARK A. HURD, | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Northern District of California
Jon S. Tigar, District Judge, Presiding

Argued and Submitted July 7, 2016
San Francisco, California

Filed January 19, 2017

Before: Marsha S. Berzon and N. Randy Smith, Circuit
Judges and Dana L. Christensen,[*] Chief District Judge.

Opinion by Chief Judge Christensen

---

[*] The Honorable Dana L. Christensen, Chief District Judge for the
U.S. District Court for the District of Montana, sitting by designation.

## SUMMARY[**]

### Securities Fraud

The panel affirmed the district court's dismissal of a securities fraud action alleging violations of the Securities Exchange Act of 1934.

Shareholders of Hewlett-Packard Company alleged that the company CEO and chairman violated the corporate code of ethics after publicly touting the business's high standards for ethics and compliance. The panel held that the shareholders failed to state a claim for securities fraud because they failed to sufficiently allege that the defendants made a material misrepresentation or misleadingly omitted a material fact.

### COUNSEL

Ira M. Press (argued), Mark A. Strauss, and Thomas W. Elrod, Kirby McInerney LLP, New York, New York; for Plaintiff-Appellant.

Marc J. Sonnenfeld (argued), Karen Pieslak Pohlmann, and Laura Hughes McNally, Morgan Lewis & Bockius LLP, Philadelphia, Pennsylvania; Thomas M. Peterson and Joseph E. Floren, Morgan Lewis & Bockius LLP, San Francisco, California; Robert E. Gooding, Morgan Lewis & Bockius

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

LLP, Irvine, California; for Defendant-Appellee Hewlett-Packard Company.

Lawrence D. Lewis (argued), Dwight L. Armstrong, and Keith Paul Bishop, Allen Matkins Leck Gamble Mallory & Natsis LLP, Irvine, California; Amy Wintersheimer Findley, Allen Matkins Leck Gamble Mallory & Natsis LLP, San Diego, California; for Defendant-Appellee Mark V. Hurd.

**OPINION**

CHRISTENSEN, Chief District Judge:

In 2010, Defendant-Appellee Mark Hurd resigned from his position as CEO and Chairman of Defendant-Appellee Hewlett-Packard Company ("HP"). During the course of an investigation prompted by allegations of sexual harassment, HP discovered that Hurd had misrepresented his relationship with a former independent contractor, Jodie Fisher. Hurd had not been forthcoming about the personal nature of his relationship with Fisher; in fact, he had doctored expense reports to prevent its discovery and lied to investigators. Immediately following Hurd's resignation, the price of HP stock dropped, resulting in an alleged loss of $10 billion. In this putative class action lawsuit, HP shareholders allege violations of the Securities Exchange Act of 1934. The shareholders purchased HP stock between November 13, 2007, and August 6, 2010 ("the Class Period") and held shares as of August 6, 2010.

This Court has not decided when a high-ranking employee's violation of a business's ethical code may give rise to a cause of action under § 10 and Rule 10–b of the

Securities Exchange Act of 1934. Here, the issue is relatively narrow—whether shareholders may bring a claim for securities fraud when a CEO and Chairman violates the corporate code of ethics after publicly touting the business's high standards for ethics and compliance. Retail Wholesale & Department Store Union Local 338 Retirement Fund ("Retail Wholesale"), lead plaintiff in the putative class action, claims that security fraud arises from the conflict between Hurd's unethical behavior and HP's promotion of business ethics. Defendants argue that Retail Wholesale failed to sufficiently allege that Defendants had made a material misrepresentation or misleadingly omitted a material fact. Affirming the district court below, we hold that Retail Wholesale has failed to state a claim under the Securities Exchange Act of 1934.

This Court reviews de novo a district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 700–01 (9th Cir. 2012). In addition to the plausibility pleading standard applicable to all complaints, Retail Wholesale's fraud allegations must satisfy the particularity standard of Federal Rule of Civil Procedure 9(b), as well as the heightened pleading standard for securities fraud created by the  Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4. *Id.* at 701. Under the PSLRA, plaintiffs must, among other requirements, "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u–4(b)(1)(B).

## I.  FACTUAL AND PROCEDURAL HISTORY

### A.  Facts

*The Triggering Event: Mark Hurd's Sexual Harassment Scandal*

In the fall of 2007, Jodie Fisher began working part-time for HP as an independent contractor.[1]  Fisher's contract required her to introduce significant clients to Hurd at HP events held at hotels throughout the world.  She worked in this capacity for approximately two years.

In the summer of 2010, about nine months after Fisher stopped contracting with HP, Fisher's attorney, Gloria Allred, sent a letter to HP's Board of Directors.  Asserting claims of discrimination against both Hurd and HP, Allred alleged that Hurd had sexually harassed Fisher.  In addition to the harassment allegations, Allred wrote that Hurd had given Fisher confidential information about an impending merger.

HP's Board promptly launched an investigation. Initially, Hurd lied to the Board about the nature and scope of his relationship with Fisher and about his familiarity with Fisher's prior work in adult films. The investigation revealed that Hurd and Fisher spent more time together during HP events than Hurd had represented.  It also uncovered that Hurd doctored expense reports on several occasions, claiming that he had eaten dinner with his bodyguard when he had in

---

[1]  Because Retail Wholesale appeals from the district court's order granting Defendants' motion to dismiss, the facts are taken from Plaintiffs' complaint and are assumed to be true.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2002).

fact dined alone with Fisher. At least twice, Hurd expensed meetings with Fisher when there had been no nearby HP event. Some time before the investigation concluded, Hurd admitted that he and Fisher had a "very close personal relationship." Without having interviewed Fisher or her attorney, the investigating law firm did not find evidence of sexual harassment or insider trading, but it concluded that Hurd falsified expense reports and lied about his relationship with Fisher.

Hurd resigned from HP shortly after the investigation concluded. In a press release, HP acknowledged Hurd's knowing violation of HP's code of conduct, confirming that sexual harassment allegations had been made and that an investigation found unethical behavior. Hurd was quoted as saying, "As the investigation progressed, I realized that there were instances in which I did not live up to the standards and principles of trust, respect and integrity that I have espoused at HP and which have guided me through my career." Immediately following Hurd's resignation, the price of HP stock dropped, resulting in an alleged loss of $10 billion to HP's stockholders.

*Background: HP's 2006 Ethics Scandal*

A few years earlier, in 2006, a major scandal erupted when a whistleblower informed several government agencies that HP had hired detectives to monitor the phone records and email accounts of HP directors, HP employees, and journalists to find the sources of leaks of company information to the press. Criminal charges were brought against HP's then-Chairwoman and General Counsel. Although Hurd had been CEO throughout this time, having taken the position in 2005, he was found free from

wrongdoing. The scandal had the effect of bolstering his reputation for integrity. Following the then-Chairwoman's departure, HP integrated the roles of Chairman and CEO and named Hurd as the company's first joint Chairman and CEO. Under Hurd's leadership, HP's shares remained buoyant during the 2006 scandal, dipping only for a brief time during which Hurd's own involvement in the monitoring was questioned.

Apparently as a result of the 2006 scandal, HP intensified its promotion of ethical behavior within the company. With Hurd at the helm, HP reinforced the importance of its corporate code of ethics, the Standards of Business Conduct ("SBC"). Through congressional testimony, press releases, investor briefings, and public letters to employees, Hurd took many opportunities to proclaim HP's integrity and its intention to enforce violations of the SBC. HP, its stockholders, and Wall Street insiders viewed Hurd as one of HP's most valuable assets, seeing his leadership as the 2006 scandal's silver lining.

Shareholders filed multiple derivative claims in the wake of the 2006 scandal, all of which were settled together in 2007. HP made some promises regarding business ethics as part of the settlement, including: appointing a "Lead Independent Director," tasked with implementing and enforcing the SBC; appointing a "Chief Ethics and Compliance Officer" to report SBC violations; appointing an "Ethics and Compliance Committee" to oversee HP's policies and procedures regarding compliance and ethics; improving ethics and compliance training programs; and strengthening the SBC, particularly in regard to whistleblowing.

*Defendants' Statements Regarding Business Ethics*

Hurd led the charge to strengthen and ensure compliance with the SBC. After HP redoubled its commitment to corporate ethics and before Allred's letter triggered the investigation into Hurd's relationship with Fisher, HP revised the SBC. Hurd wrote the introductory message, describing the importance of ethics and entreating HP's employees to "commit together, as individuals and as a company, to build trust in everything we do by living our values and conducting business consistent with the high ethical standards embodied within our SBC."

Many of Defendants' representations regarding ethics and compliance were made outside of the Class Period. The 2006 scandal predated the Class Period, as did the strongest statements made by Hurd and HP allegedly elevating the importance of the SBC. For example, Retail Wholesale points to a letter sent to employees, statements made during press conferences, and congressional testimony, all of which occurred during 2006. It was during this time that Defendants suggested having implemented a zero-tolerance policy for SBC violations, informing employees that: "Any violations of our standards are unacceptable to Hewlett-Packard and we will take appropriate action."

The complaint alleges fewer instances of representations made during the Class Period. Most notably, the SBC itself was updated and released, including Hurd's prefatory message. Concurrently with the release of the updated ethical code, HP published the SBC on the investor-relations portion of HP's website. Additionally, during this time, HP restructured its internal organization, creating procedures and positions designed to improve compliance and ethical

conduct, and  HP's Chief Ethics and Compliance Officer stated that ethics and compliance were a "competitive advantage" for HP.

The SBC includes several provisions inconsistent with Hurd's relationship with Fisher and its cover-up.  Retail Wholesale draws attention to particular provisions within the SBC, all of which are stated affirmatively and in the present tense.  For example, HP states in the SBC that "[w]e maintain accurate business records" and "create business records that accurately reflect the truth of the underlying transaction or event."  The SBC contains similarly worded statements regarding: honesty; cooperation with investigators; using good judgment; reporting misconduct; treating others with respect; avoiding unlawful discrimination; refusing to tolerate harassment; preserving assets; avoiding conflicts of interest; providing gifts appropriately; preventing insider trading; and protecting confidential information.

During the Class Period, HP also asserted that the strength of its business was tied to retaining executives such as Hurd. In its 10–K and 10–Q filings with the SEC, HP included a risk factor: "The failure to hire executives and key employees or the loss of executives and key employees could have a significant impact on our operations."

### B.  Procedural History

Cement & Concrete Workers District Council Pension Fund initiated this putative class action in the summer of 2012, and filed its First Amended Complaint ("FAC") later in 2012.  Plaintiffs claimed that Defendants committed securities fraud in violation of the Securities Exchange Act of 1934.  Upon motions to dismiss for failure to state a claim

filed by Defendants HP and Hurd, the district court dismissed the FAC without prejudice, determining that the Plaintiffs had failed to adequately allege materiality and falsity.

Retail Wholesale filed the Second Amended Complaint ("SAC") shortly after the court's first order granting dismissal. HP and Hurd again moved to dismiss for failure to state a claim, and the district court again granted their motion, this time with prejudice, finding that any further amendments would be futile. As in its first order, the district court determined that Retail Wholesale's claims could not survive because materiality and falsity had not been alleged. Retail Wholesale timely appealed.

## II. DISCUSSION

Section 10(b) of the Securities Exchange Act of 1934 prohibits the use of "any manipulative or deceptive device or contrivance" related to the purchase or sale of securities when the use violates the regulations promulgated by the Securities and Exchange Commission ("SEC"). 15 U.S.C. § 78j(b). Under the operative regulation, Rule 10b–5, it is unlawful for any person "[t]o make any untrue statement of fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

To be viable, a claim brought under § 10(b) and Rule 10b–5 must contain six essential elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6)

loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). Our discussion focuses on the first element—whether there was a material misrepresentation or omission—as that factor is the issue most hotly contested by the parties, and its resolution is dispositive of the case.

An actionable material misrepresentation or omission has two components. First, under the PSLRA and the Federal Rules of Civil Procedure, plaintiffs must allege a misrepresentation or a misleading omission with particularity and explain why it is misleading. 15 U.S.C. § 78u–4(b)(1)(A)–(B); Fed. R. Civ. P. 9(b). Second, applying an objective standard, that misrepresentation or omission must have been material to investors. 15 U.S.C. § 78u–4(b)(1)(A)–(B). The materiality of the misrepresentation or an omission depends upon whether there is "a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" for the purpose of decisionmaking by stockholders concerning their investments. *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

Retail Wholesale has raised two theories in support of its argument regarding this element. First, it asserts that there were material misrepresentations—specifically, that Defendants' public statements about business ethics, particularly the SBC itself, were material representations made demonstrably false by their inconsistency with Hurd's conduct. Second, it argues that there were material omissions, contending that Defendants misled investors by

failing to meet a duty owed to investors to disclose Hurd's unethical behavior.  Because neither Defendants' statements nor their omissions were misleading, both theories fail.

## A.  Material Misrepresentation

Retail Wholesale argues that the SBC, bolstered by Defendants' express promotion of corporate ethics, gives rise to a finding of material misrepresentation.  Its claim is based in three factual allegations: (1) HP and Hurd actively promoted the SBC and stated that HP had zero tolerance for SBC violations; (2) Hurd's SBC violations led to his resignation; and (3) Hurd's resignation caused HP's stock price to drop.  The Court cannot agree that, under the facts alleged in the complaint, Defendants' representations about ethics were materially misleading.

Like the district court below, some courts that have considered whether a corporate code of ethics may give rise to a § 10 and Rule 10b–5 claim have found that the claim failed for lack of materiality, never reaching falsity, *see Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 976–77 (N.D. Cal. 2015), or reaching falsity only after first finding a lack of materiality, *see In re Yum! Brands, Inc. Sec. Litig.*, 73 F. Supp. 3d 846, 864–65 (W.D. Ky. 2014).  Others have analyzed falsity first and not considered materiality after determining that no misleading representation or omission was made.  *See City of Roseville Emps.' Ret. Sys v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404 (D. Del. 2009); *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 685–86 (D. Colo. 2007).  Where a complaint arises from "soft information," such as representations of compliance, the Sixth Circuit applies a wholly different analysis, considering scienter alongside materiality to determine whether a

representation is an actionable misrepresentation.  *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 470–73 (6th Cir. 2014).

The Ninth Circuit has not addressed how to determine whether statements made in or about an ethical code are actionable representations if the ethical code is violated.  We approach this issue here by first analyzing falsity, to determine whether an ethical code and statements made about the code contain any misrepresentations of fact, and then, if there was a misrepresentation, determining its materiality— that is, its significance to stockholder decisionmaking.**[2]**

### 1. Objective Falsity

"[A] statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'"  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).  To be misleading, a statement must be "capable of objective verification."  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). For example, "puffing"—expressing an opinion rather than a knowingly false statement of fact—is not misleading.  *Id.*; *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206–07 (9th Cir. 2016); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).

Defendants made no objectively verifiable statements during the Class Period.  As one court has aptly written, a

---

**[2]** There may be instances in which another order of decision is more efficient. We do not mean to prescribe any particular sequence of analysis.

code of conduct is "inherently aspirational." *Andropolis*, 505 F. Supp. 2d at 686. Such a code expresses opinions as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to its aspirations. *See id.*

Similarly, Hurd's comments prefacing the SBC are not objectively verifiable. In the 2008 preface to the SBC, Hurd stated, in part,

> We want to be a company known for its ethical leadership . . . .
>
> We know actions speak louder than words. We must make decisions and behave in ways that we can be proud of, that reflect our commitment to doing the right thing.
>
> . . . .
>
> . . . Let us commit together, as individuals and as a company, to build trust in everything we do by living our values and conducting business consistent with the high ethical standards within our SBC.

The aspirational nature of these statements is evident. They emphasize a desire to commit to certain "shared values" outlined in the SBC and provide a "vague statement[] of optimism," not capable of objective verification. *See Or. Pub. Emps.*, 774 F.3d at 606.

A contrary interpretation—that statements such as, for example, the SBC's "we make ethical decisions," or Hurd's

prefatory statements, can be measured for compliance—is simply untenable, as it could turn all corporate wrongdoing into securities fraud. *See, e.g., Santa Fe Indus. v. Green*, 430 U.S. 462, 478–89 (1977) (holding that the Securities Exchange Act is limited in scope to its textual provisions and does not conflict with state law regarding corporate misconduct, particularly corporate mismanagement). Indeed, at oral argument, Retail Wholesale conceded that the SBC in and of itself could not support its claim and acknowledged that it has been unable to locate a case from any jurisdiction in which a court found alleged noncompliance with an ethical code actionable.

Nor does the context, as Retail Wholesale argues, somehow make the SBC and related representations capable of being objectively false. The case that comes closest to supporting Retail Wholesale's context argument, *Omnicare*, decided by the Sixth Circuit, involved not a code of ethics but rather a Form 10–K annual report to the SEC. 769 F.3d at 463–64. According to the *Omnicare* complaint, the defendants, a pharmaceutical care provider and its current and former employees, conducted internal audits revealing pervasive Medicare fraud. *Id.* at 462, 479. The audits were consistent with the defendants' recent history of non-compliance, including conduct leading to a $98 million settlement with the government. *Id.* at 478. After the audits, the defendant certified in its Form 10–K that it was in material compliance with state and federal law. *Id.* Although the language in the Form 10–K was vague and boilerplate, the Sixth Circuit determined that the complaint did not fail for lack of falsity or materiality. *Id.* at 478–80.

Retail Wholesale argues that, similar to the *Omnicare* context, the context in this case surrounding the adoption and

promotion of the SBC transforms what would otherwise be aspirational into statements capable of objective verification. We disagree, in part because context more appropriately factors into the question of whether an alleged misrepresentation was material to investors, not into whether a statement itself could be a misrepresentation. *See Matrixx*, 563 U.S. at 43–47.

Even if background facts were relevant to whether a statement is amenable to falsity, the totality of the statements made within the Class Period leads only to the proposition that business ethics are important to HP. We note that the case may have been closer had Hurd's sexual harassment and false expenses scandal involved facts remotely similar to those presented by the 2006 scandal, as the ethical code could then have been understood as at least promising specifically not to do what had been done in 2006. Here, however, the context does not make HP's promotion of business ethics any less subjective or vague. Further, Retail Wholesale cites to no case law suggesting that context may operate to allow a plaintiff to import an out-of-Class-Period *statement* into the Class Period. The strongest statement alleged in the complaint—the suggestion of a zero tolerance policy for SBC violations—was made outside of the Class Period.

In sum, we conclude that as there was no statement during the Class Period that was capable of being objectively false, there was no affirmative misrepresentation.

### 2. *Materiality*

Additionally, although the threshold for a showing of materiality is lower than that for falsity, we agree with the reasoning of the district court that any affirmative

misrepresentation could not have been material. It cannot be said that there is "a substantial likelihood" that the SBC and related representations "altered the 'total mix' of information made available" for use in stockholder decisionmaking. *Basic*, 485 U.S. at 231–32. Not only was there nothing unusual about the promotion of business ethics at HP, but the substance and online publication of the SBC were mandated by the SEC. 17 C.F.R. § 229.406(a). In fact, the ethical issues most relevant to this litigation—conflicts of interest, disclosure, internal handling of violations—are directly addressed by SEC regulations. *Id.*

Although materiality is generally an issue of mixed fact and law, best left to the fact-finder, *Matrixx*, 563 U.S. 45–48, a standard that is too low would "bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking." *TSC Indus.*, 426 U.S. at 448–49. It simply cannot be that a reasonable investor's decision would conceivably have been affected by HP's compliance with SEC regulations requiring publication of ethics standards.

Further, Retail Wholesale's contention that a slump in HP's stock indicates materiality is not well-taken. "[E]vidence of stock price movements provides no rational basis for determining whether [a product's] risks were adequately conveyed to the public." *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989). As this Court recently noted, a change in stock price, such as that following Hurd's resignation, would factor into reliance, a different prong of the § 10(b) and Rule 10b–5 analysis, and "[a]bsent an actionable misstatement, reliance does not come

into play." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014).**[3]**

In sum, the representations made in and about the SBC were not material to stockholder decisionmaking.

## B. Materially Misleading Omission

As an alternative theory, Retail Wholesale argues that Defendants' failure to disclose material facts—namely, the facts concerning Hurd's noncompliance with the SBC—is actionable. We disagree. Just as there was no statement capable of being factually misleading, there was no omission that could have been actionable as misleading.

Absent a duty to disclose, an omission does not give rise to a cause of action under § 10(b) and Rule 10b–5. *Basic*, 485 U.S. at 239 n.17. "[Section] 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx*, 563 U.S. at 44. An actionable omission claim arises only when disclosure is "necessary . . . to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R.

---

**[3]** Although we do not reach the issue, having failed to find an actionable misstatement, we note that we are somewhat perplexed by Retail Wholesale's argument that it was the falsity of the SBC that led to their damages. To the contrary, it appears that HP's ethics and compliance policies worked. Hurd did not live up to HP's standards; HP became aware of Hurd's ostensible misconduct; HP quickly launched an investigation, confirming the misconduct; and Hurd resigned. In fact, given Retail Wholesale's position that Hurd's resignation triggered the decline in stock value, it's entirely possible that the strength—as much as the weakness—of the SBC factored into Retail Wholesale's claimed damages.

§ 240.10b–5(b).    In other words, a duty to provide information exists only where statements were made which were misleading in light of the context surrounding the statements.

Here, there was no duty to disclose because HP's and Hurd's failures to speak did not "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006. As noted, the SBC, and the statements within the Class Period promoting it, were transparently aspirational.  The promotion of ethical conduct at HP did not reasonably suggest that there would be no violations of the SBC by the CEO or anyone else.   Nor did Hurd's own statements warrant that he had been personally compliant or that he personally would comply with the SBC in the future.

The analysis would likely be different if HP had continued the conduct that gave rise to the 2006 scandal while claiming that it had learned a valuable lesson in ethics. However, that is not the case here.  Although the facts reflect misbehavior by the corporation's highest executive in violation of its ethical code, the fact that HP and Hurd enhanced and touted the SBC does not, without more, transform the misbehavior into an actionable material omission under the securities laws.

Because the affirmative statements did not create an impression of full compliance, HP and Hurd had no duty to disclose Hurd's misuse of CEO authority and misbehavior in violation of the SBC.

## III.    CONCLUSION

The complaint does not give rise to an actionable claim for securities fraud.  This is not to say that Hurd's conduct was consistent with the general ethical values espoused within the SBC and related statements.  Indeed, Hurd did not demonstrate the "uncompromising integrity" asked of him by the SBC.  However, there was no fraud.  The statements made were aspirational, and neither Hurd nor HP warranted total compliance with the SBC.  Nor did Hurd, personally, attest to stockholders that he was not behaving as it turned out he was.  In short, there were no material misrepresentations or actionable material omissions.  Further, even if the complaint adequately alleged the existence of a misrepresentation or a misleading omission, it would not have been actionable, as it was immaterial.

**AFFIRMED.**