3. J.P. Morgan's Compensation from Akorn
All three plaintiffs sought disclosures regarding J.P. Morgan's compensation from Akorn and Fresenius. As to J.P. Morgan's "specific compensation figures,"[5] Akorn disclosed that information in the original proxy:
J.P. Morgan received a fee from the Company of $3 million, paid upon the public announcement of the merger, which will be credited against any Services Fee (as defined below). For services rendered in connection with the merger, the Company has agreed to pay J.P. Morgan an additional fee equal to 1.0% of the total amount of cash paid to the Company's common stockholders...immediately prior to the consummation of the merger (the "Service Fee"), which in this case amounts to approximately $47 million.
R. 65-1 at 55 (p. 45). Plaintiffs argue that this quote is taken out of context and does *621 not specifically indicate whether the fee is contingent on the consummation of the merger. See R. 65 at 14 & n. 13. The Court has reviewed the context of this quote and finds that it does not change its meaning. The amount of potential compensation ($47 million) is abundantly clear.
The revised proxy added language expressly stating that J.P. Morgan's fee was "contingent and payable upon the closing of the merger." R. 85-2 (17 C 5016) at 22 (p. 45). But Plaintiffs did not seek this information in their complaint. And in any case, although the fact that J.P. Morgan's fee is contingent on consummation was not expressly stated in the original proxy, such an arrangement is certainly customary, and can be inferred from the fact that the amount of the fee will ultimately be measured only "immediately prior to consummation" and is defined as a percentage of the amount to be paid in the transaction. Even if Plaintiff had sought this information in their complaint, it is not plainly material.
4. J.P. Morgan's Compensation from Fresenius
Although Plaintiffs do not address it in their current briefing, they also sought disclosure of "the exact amount of money J.P. Morgan received and may continue to receive from [Fresenius] while acting as Akorn's financial advisor."[6] The Court finds the exact historical payments are not material. See Bushansky , 262 F. Supp. 3d at 753 ("Additionally, Plaintiffs have not presented any evidence or case law establishing that the inclusion of historical fees in similar situations is material."). And the proxy does not indicate that J.P. Morgan was "continuing" to receive payments from Fresenius in any event.
5. "Upside" of the "Stand-Alone Strategic Plan"
Plaintiff Carlyle sought four additional disclosures not sought by Plaintiffs House or Pullos. First, Carlyle sought the following disclosure:
The Proxy also refers to "the potential upside in the Company's stand-alone strategic plan," which the Board purportedly considered in determining to recommend approval of the Proposed Transaction. Proxy at 39. Yet, the Proxy fails to disclose any further information concerning that "stand-alone strategic plan" or its "potential upside" or exactly why the Board determined it would be in the best interest of the Company and its shareholders to pursue potential strategic alternatives rather than a stand-alone strategic plan.
17 C 5022, R. 1 ¶ 46; see also id. ¶ 45. It is apparent from context that "stand-alone" means Akorn not merging with another company. The "upside" of that scenario is also readily apparent, in that avoiding merger means avoiding the costs and the relinquishment of control inherent to the merger. The proxy explains that the Board believed "that the Company's stand-alone strategic plan involved significant risks in light of the industry and competitive pressures the Company was facing and the Board's concerns with respect to the risks relating to the Company's ability to execute on its strategic plan including the possibility that the strategic plan may not produce the intended results on the targeted timing or at all." R. 65-1 at 47 (p. 37). Although the proxy does not detail what "industry risks" and "competitive pressures" the company faced, it is sufficient for the Board to express such concerns *622 generally. Moreover, the Board translated those concerns into financial projections that were provided in the proxy. While it may have been helpful or interesting for shareholders to learn greater detail about how management perceived the industry landscape, such information was not necessary for shareholders to evaluate the merger. Furthermore, Carlyle settled the case without receiving this information. That fact casts significant doubt on whether this information was truly material.
6. "Substance" of the March 2017 Projections
Carlyle also sought disclosure of "complete information concerning the substance of the March 2017 [projections] or the assumptions, analysis, projections, or conclusions reflected therein," 17 C 5022, R. 1 ¶ 48, and the "financial analyses and forecasts" J.P. Morgan reviewed, id. ¶ 50. But "completeness" is not the standard. See Brody v. Transitional Hosps. Corp. , 280 F.3d 997, 1006 (9th Cir. 2002) ("incomplete" statements are not necessarily "misleading"). Further, there is presumably a great deal of information underlying the March 2017 projection on which the proxies rely. Carlyle does not identify what information in particular was necessary for shareholders to be able to evaluate the merger. And again, Carlyle settled without receiving this information, casting doubt on its materiality.
7. Other Potential Buyers
Carlyle contends that the proxy should have detailed the other potential buyers the Board considered and why the Board determined that "it was highly unlikely that any of those counterparties would be interested in an acquisition of the Company at that time due to competing strategic priorities and recent acquisitions in the industry." 17 C 5022, R. 1 ¶¶ 58-59. But this statement speaks for itself regarding why the Board rejected other companies in the industry as potential buyers. And as Carlyle notes, the proxy gives much greater detail regarding the one other company ("Company E") Akorn actually considered. Detailed information about potential buyers Akorn did not actually consider is not material.
8. Pending Litigation
Finally, Plaintiff Pullos alleges that "the Board may be using the Proposed Merger as a vehicle to salvage their professional reputations and potentially absolve themselves of liability arising from federal securities and related derivative litigation currently pending in the Northern District of Illinois." 17 C 5026, R. 1 ¶ 47. Pullos claims that the proxy improperly "fails to disclose whether these lawsuits were discussed by the Board and whether the Board took them into account when deciding to undertake the sales process and enter into the Merger Agreement." Id. But the lawsuits were public record prior to issuance of the original proxy, and Pullos's allegation that the Board had ulterior motives for the merger related to the lawsuits is unfounded and does not seek "information" relevant to the merger. To the extent the Board might have had ulterior motives, that is not information that is "disclosable" in the sense required here. The proxy in its entirety is a refutation of Pullos's allegation in that the proxy gives reasons unrelated to the lawsuits for supporting the merger. Pullos's unfounded speculation about the Board's motives does not constitute an information request. And similar to Carlyle's claims, the fact that Pullos settled without provision of information related to this claim indicates that it was not material.
Conclusion
Therefore, the Court finds that the disclosures sought in the three complaints *623 at issue were not "plainly material" and were worthless to the shareholders. Yet, Plaintiffs' attorneys were rewarded for suggesting immaterial changes to the proxy statement. Akorn paid Plaintiffs' attorney's fees to avoid the nuisance of ultimately frivolous lawsuits disrupting the transaction with Frensenius. The settlements provided Akorn's shareholders nothing of value, and instead caused the company in which they hold an interest to lose money. The quick settlements obviously took place in an effort to avoid the judicial review this decision imposes. This is the "racket" described in Walgreen , which stands the purpose of Rule 23's class mechanism on its head; this sharp practice "must end." 832 F.3d at 724.
Plaintiffs' cases should have been "dismissed out of hand." See id. at 724. Since the Court failed to take that action, the Court exercises its inherent authority to rectify the injustice that occurred as a result. See Dale M., ex rel. Alice M. v. Bd. of Educ. of Bradley-Bourbonnais High Sch. Dist. No. 307 , 282 F.3d 984, 986 (7th Cir. 2002). The settlement agreements are abrogated and the Court orders Plaintiffs' counsel to return to Akorn the attorney's fees provided by the settlement agreements. Plaintiffs' counsel should file a status report by July 8, 2019 certifying that the fees have been returned.

17 C 5018 (House), R. 1 ¶ 45; 17 C 5022 (Carlyle), R. 1 ¶ 56; 17 C 5026 (Pullos), R. ¶ 44; see also 17 C 5022 (Carlyle), R. 1 ¶ 54.

See 17 C 5018 (House), R. 1 ¶ 46; 17 C 5022 (Carlyle), R. 1 ¶ 55; 17 C 5026 (Pullos), R. 1 ¶ 46.